ANNE ARUNDEL COUNTY, MARYLAND ET AL.
*v.* McDONOUGH ET AL.

[No. 4, September Term, 1975.]

*Decided March 9, 1976.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE and O'DONNELL, JJ.

*Jay I. Morstein* and *Stephen H. Sachs*, with whom were *Elizabeth Logan Nilson, Michael R. Roblyer, John M. Court* and *Emile J. Henault, Jr.*, on the brief, for appellants.

*Amicus Curiae* brief filed by State of Maryland, *Francis B. Burch, Attorney General*, and *George A. Nilson, Assistant Attorney General*, on the brief.

*Wilson K. Barnes* and *Marvin H. Anderson* for appellees.

O'DONNELL, J., delivered the opinion of the Court. SINGLEY, J., concurs in the result. MURPHY, C. J., and LEVINE, J., dissent and LEVINE, J., filed a dissenting opinion in which MURPHY, C. J., concurs at page 308 *infra.*

The issues before us in this case pertain to the legality and regularity of a referendum, submitted to the electorate of Anne Arundel County on 41 amendments, adopted by the

County Council, when it enacted a comprehensive zoning ordinance for the County's Fourth Tax Assessment District, affecting in particular acreage located within the median of Maryland Route 3, and properties abutting each side of that highway.

Maryland Route 3, running through the County from north to south, traverses portions of the Second, Third and Fourth Tax Assessment Districts. In the early 1950's, the State Roads Commission converted what was originally a two-lane road to a four-lane separated thoroughfare. In this dualizing process the present southbound lanes were constructed some distance westward of the original highway, thus creating a median area, ranging in width from 50 to 500 feet — with a fairly typical width of 300 feet — which extends from property occupied by a Howard Johnson's Restaurant (on the north), in the vicinity of New Cut Road, near Glen Burnie, to the county line (on the south), at the Patuxent River.

Since the highway construction, older residences within the median have continued to be occupied; although several "sample" homes, used to advertise and sell prefabricated dwellings have been therein erected, no new residential construction has taken place in the median. From the very nature of this enclave, there had been substantial commercial development within the median up until 1973, and the properties therein came to enjoy commercial zoning classifications.

On May 24, 1973, Bill No. 59-73 was submitted to the County Council, proposing a comprehensive rezoning for the Fourth Tax Assessment District and the adoption and application of new zoning maps to the Alternate Zoning Regulations contained in the Anne Arundel County Code. The import of the Bill, as submitted, basically "down-zoned" the commercial properties located within the median to R1 (Residential) classifications; it proposed as well the down-grading of the commercial properties, along the eastern and western boundaries of Route 3 to R1 and RA (Residential Agricultural) classifications.[1]

---

1. One property, along the west side of the southbound lanes of Route 3, was proposed for a W1B (Industrial Development) classification.

Prior to the submission of the Bill, and prior to the release of the proposed legislation to the public on April 3, 1973, the County's Office of Planning and Zoning, the sponsor of the legislation and the originators of the map revisions, conducted three public hearings within the affected district. Announcements of such meetings were placed in three local newspapers, the *Villager*, the *Maryland Gazette* and the *Anne Arundel Times*, all having a general circulation within the county. Mrs. Marian J. McCoy, the County Planning and Zoning officer, in the lower court, gave testimony that a general announcement had as well been sent out

> "[t]o as many people that we could find from the tax records [so] that, if their property was affected, ... they would basically know, at least as far as the *suggested* maps were concerned that they should take some interest in the process. ... Basically, a notice went out advising [that] the property was being suggested from such-and-such a classification to such-and-such a classification, and that information was available at our office, including, if they wished, a list of what the permitted uses were in that particular classification." (emphasis added).

The reason for the proposed "down-zoning" of the properties, within the median, and along the Route 3 corridor, from commercial to residential, according to the testimony of Mrs. McCoy, was because "in the light of dangerous traffic conditions along Route 3, it would be in the best interests of the health, safety and general welfare of the County." She further testified that the Planning Board "wanted to certainly not see any *further* commercialization along the Highway until something was done in order to correct what they considered to be a very dangerous condition due to the traffic and the accident rates that they became familiar with." (emphasis added).

After the public hearings conducted by the Office of Planning and Zoning, the comprehensive zoning ordinance, with accompanying maps — apparently unchanged as a result of the hearings — was submitted to the County

Council. The Council conducted eight public hearings on the proposed legislation. As a result of those hearings, various councilmen proposed a total of 145 amendments to the Bill and its accompanying maps. Four additional public hearings were held by the Council on the proposed amendments, and on August 6, 1973, those 145 amendments to the comprehensive zoning plan and accompanying maps were adopted. As amended, Bill No. 59-73 was passed by the Anne Arundel County Council on August 20, 1973 and submitted to the then County Executive Joseph Alton.

Pursuant to § 405 (h) of the Anne Arundel County Charter, granting the county executive the right "to veto, in his discretion, ordinances of the County Council . . . and to return the same to the Council . . .," Mr. Alton, on August 30, exercised his veto prerogative as to 87 of the proposed 145 amendments, concurred in the remaining 58, and on August 31, 1973, returned Bill No. 59-73 to the Council. The Council sustained the executive's veto as to 31 of the amendments it had adopted, and overrode the veto of the remaining 56. Thus, the proposed comprehensive zoning ordinance, as proposed in Bill No. 59-73, was finally enacted by the County Council on September 4, 1973, with 114 amendments and map changes.

Disagreeing with the Council's legislative wisdom, certain citizen groups and civic associations, undertaking to act pursuant to Section 308 of Article III of the Anne Arundel County Charter and Article XVI of the Constitution of Maryland, circulated petitions in the form required by Maryland Code (1957, 1971 Repl. Vol.) Art. 33, § 23-3, and obtained the signatures of the requisite number of registered voters to bring to referendum 41 specifically selected amendments of the 114 adopted by the Council.[2]

---

2. Although the circulated petitions contained a verbatim account of each of the 41 amendments petitioned to referendum (Nos. 34, 39, 40, 41, 42, 43, 44, 45, 46, 49, 55, 56, 58, 59, 68, 72, 73, 75, 77, 79, 80, 85, 86, 87, 88, 90, 91, 92, 96, 97, 100, 105, 106, 113, 136, 137, 140, 141, 143, 144 and 145), including a metes and bounds description of each affected property, a description of the zoning proposed in the ordinance as submitted, and that resulting by virtue of the amendment adopted, the printing was so condensed on the petition forms that it could not be read by the signatories, except with the assistance of a magnifying glass. The record confirms this want of readability.

The 41 amendments petitioned to referendum affected the zoning on 42 tracts of land. Twenty-six of the amendments (Nos. 39, 40, 41, 43, 44, 45, 46, 58, 80, 85, 86, 87, 88, 90, 91, 92, 96, 97, 100, 113, 136, 137, 140, 141, 143 and 145) related to properties wholly within the median strip between the roadways of Route 3; one amendment (No. 86) involved two properties, with the same ownership, one lying within the median strip and the other, opposite thereto, fronting on the westernmost side of the highway's southbound lanes; nine amendments (Nos. 34, 42, 56, 59, 68, 72, 105, 106 and 144) pertained to properties fronting entirely on the westernmost right-of-way line of the southbound lanes and five of the amendments (Nos. 49, 55, 75, 77 and 79) had to do with properties fronting entirely on the easternmost right-of-way line of the highway's northbound lanes. The last amendment on referendum (No. 73) involved the zoning of two contiguous properties — 10 miles distant from Route 3 — located on Brockridge Road, near Maryland City, in Laurel, but within the Fourth Tax Assessment District of Anne Arundel County.

As introduced, the ordinance undertook to "down-zone" every commercially used property within the median to that of R1 (Residential). Amendment No. 44 changed that proposed residential use to C2 (Commercial, office); amendments Nos. 46 and 140 changed such proposed use to a classification of C3 (General Commercial), as did amendment No. 80, for a portion of the tract covered by it. All the remainder of the amendments, as to properties within the median, changed the proposed residential classification to C4 (Highway Commercial). Thus, the amendments, as affecting the properties within the median, retained the zoning uses in effect prior to the introduction of the legislation.

Pursuant to amendment No. 56, property on the west side of the highway, proposed for an RA (Residential Agricultural) classification, was changed to a W1-B (Industrial Development) use; a W1-B classification, proposed for another of the parcels on the west side of the highway, by amendment No. 144, was changed to C2

(General Commercial). Under amendments Nos. 34 and 72, a proposed R1 (Residential) classification was changed to R5 (Residential), for other lands abutting the westernmost side of the southbound highway lanes. The five properties fronting on the easternmost northbound lane of Route 3, proposed for RA (Residential Agricultural) classifications, by amendments Nos. 49, 55, 75, 77 and 79, were changed to that of C4 (Highway Commercial). The property in Laurel — 10 miles distant from Route 3 — classified as R5 (Residential) in the original ordinance, was changed by amendment No. 73 to that of C1-A (Neighborhood Commercial). These amendments, as to properties outside the median, undertook as well to retain substantially the same zoning uses to which they had theretofore been entitled.

It must here be observed that both amendments Nos. 96 and 36 undertook to classify as C4 the property of the J. F. Johnson Lumber Co., located within the median. While amendment No. 96, which was petitioned to referendum, embraced as well four or five properties contiguous to the lumber company, amendment No. 36, not on referendum, related solely to that company's property. Notwithstanding the results of the referendum as to amendment No. 96, the J. F. Johnson Lumber Co. obtained a judicial determination, unopposed by the County, that, pursuant to amendment No. 36, its property had acquired a C4 classification.[3]

It was with this factual background that the County Council formulated the question to be submitted on referendum and certified it to the Board of Supervisors of Elections as "Question D." The Supervisors adopted the wording of the question, as submitted, for inclusion as a ballot item on the voting machines for the general election to be held on November 5, 1974. The ballot question,

---

**3.** On November 27, 1974, the J. F. Johnson Lumber Co. (one of the original complainants in these proceedings), after having filed an amended bill of complaint, was granted summary judgment, unopposed by the County, which declared that its property, pursuant to amendment No. 36, was classified as C4 (Highway Commercial) and that it was unaffected by amendment No. 96 or the results of the referendum as to that amendment.

undertaking to submit to the voters all 41 amendments to the ordinance enacted by the Council was to read as follows:

## "QUESTION NO. D
## REFERENDUM

To rezone certain parcels of land in the median strip, the west side of the southbound lane and the east side of the northbound lane of Route 3; and to rezone one parcel of land on the west side of Brockridge Road near Ellen Street; all parcels of which are in the Fourth Assessment District and which were rezoned by virtue of amendments to Bill No. 59-73.

| | |
|---|---|
| FOR THE AMENDMENTS TO THE BILL | |
| AGAINST THE AMENDMENTS TO THE BILL | |

As "Question D" however was actually placed on the voting machines, as a ballot label, the question, as worded, is followed by only the two words "FOR" and "AGAINST," rather than giving the electorate the option to vote "FOR THE AMENDMENTS TO THE BILL" *or* "AGAINST THE AMENDMENTS TO THE BILL."

On October 4, 1974 — 32 days before the election — Thomas J. McDonough and his wife, the owners of property within the median to which amendment No. 113 related, together with 20 other owners of properties, both within and without the median, affected by 20 of the other amendments [4] (the appellees and cross-appellants here), filed a bill of complaint in the Circuit Court for Anne Arundel County against the Board of Supervisors of Elections (Supervisors), subsequently amended to include Anne Arundel County, Maryland, (the County), (the

---

4. The complainants owned properties covered by amendments Nos. 39, 43, 44, 49, 58, 59, 68, 72, 73, 75, 77, 79, 80, 86, 88, 90, 91, 96, 100, 113 and 137.

appellants and cross-appellees here), which sought injunctive and declaratory relief. The complainants sought an injunction restraining the Supervisors from placing the 41 amendments and "Question D" on the ballot; they also sought a judgment declaring: (a) that Section 308, Article III of the Charter of Anne Arundel County was unconstitutional, as contrary to the provisions of Articles XVI and XI-A of the Constitution of Maryland, as well as the Express Powers Act, Code (1957, 1973 Repl. Vol.) Art. 25A; (b) that none of the provisions contained in Code (1957, 1971 Repl. Vol.) Art. 33, §§ 23-1 through 23-11, purported to delegate or to permit the filing of a referendum petition with respect to an ordinance of the County Council of Anne Arundel County; (c) that the purported description of the amendments as proposed in "Question D" was "inapplicable, deceptive, and will result in an unfair and defective election upon the purported referendum;" (d) that all 41 of said amendments "may not be lumped together under one heading and subject to one vote for all 41 ... zoning amendments as a group;" (e) that since the legislation purported to establish a comprehensive zoning map for the Fourth Assessment District and pertained to only a portion of the County, such referendum was being improperly addressed to the voters of the whole County, and (f) that the effect of such referendum would violate the complainants' rights under § 40 of Article III of the Constitution of Maryland, Art. 23 of the Declaration of Rights, and the Fifth and Fourteenth Amendments to the Constitution of the United States.

Because of the proximity of the scheduled general election, at the time the County was impleaded, and the mechanical and logistical problems attending the preparation of the voting machines (called to the court's attention by the Attorney General), the lower court (Childs, J.), passed an order on October 17, 1974 postponing the trial until November 13, 1974, but providing therein that all issues were: "preserved for the court's consideration and upon decision are to have the same force and effect as if heard and decided prior to ... the election of November 5, 1974." This

action by the trial court was in accord with our holdings in *Tyler v. Secretary of State*, 230 Md. 18, 185 A. 2d 385 (1962) and in recognition of the complainants' apprehension that their rights might be prejudiced by a post-election trial, since in *Dutton v. Tawes*, 225 Md. 484, 491, 171 A. 2d 688, 690 (1961) this Court had "clearly recognized [the] difference between the effect given to modal provisions of the election laws before [an] election and the effect of the same provisions [when viewed] after election."

Though forewarned of the complainants' objections, both legal and factual, no steps were taken to restate the content of "Question D." During the calendar week prior to the election, the Supervisors published in four newspapers of general circulation within the County, a specimen ballot as it would appear on the voting machines, including the text of "Question D." [5] The Anne Arundel County League of Women Voters published a sample ballot in its official newspaper, undertaking to give an account of all candidates and referendum issues. Twenty-three thousand copies of the League's newspaper were distributed to various post offices, banks, libraries and stores within the County.

On October 15, 1974, Mr. Alton, as the out-going County Executive, upon his official stationery, mailed a personal letter to each taxpayer within the County, at addresses taken from County tax assessment records, and enclosed therein an "explanation" of the local questions. In the letter he outlined the accomplishments of his administration, thanked the voters "for their support and thoughtful expressions of confidence in [him]," urged their support for Questions Nos. 1, E and F,[6] and exhorted the defeat of "Question D." Enclosed with the letter was a card containing the Executive's recommendations as to how to vote on the

---

5. "Question D," as it was to appear on the voting machines, was published in the *Anne Arundel Observer* on October 30, 1974, in the *Anne Arundel Times* on October 31, 1974, in the *Maryland Gazette* on October 31, 1974 and in the *Evening Capital* on November 1, 1974.

6. These local questions related to the acquisition of land for public projects and for the revitalization of a blighted area in Glen Burnie, none of which are here relevant.

respective questions. The card, as to "Question D," was as follows:

QUESTION NO D

If approved large segments of the median strip of Route 3 would be zoned commercial, thereby allowing service stations, fast food stores and other strip commercial uses to locate in the middle of this highway. The number of fatal accidents and serious injuries that have occurred because of the development which has taken place on the median strip makes Route 3 one of the most dangerous highways in Maryland. Please vote NO on this ballot question, QUESTION NO. D., in order to stop any further commercial development in the middle of this highway.

Although the proponents of the referendum, in their circulated petitions, had set forth verbatim each of the 41 amendments — though illegible except with the use of a magnifying glass — neither the newspaper of the League of Women Voters, nor the Board of Supervisors of Elections, nor the County Executive undertook in any way to apprise the electorate of either the specific content or the nature of any one of the amendments.

When the voters throughout Anne Arundel County went to the polls on November 5, 1974, they cast 36,656 votes "against" Question D, while 11,314 voters cast ballots "for" the question. The practical result of the voters' choice was to negate the effect of the 41 amendments, which had rejected the zoning recommended by the Office of Zoning and Planning, as submitted in the original ordinance.

When the matter came before the Circuit Court for hearing, the chancellor (Wray, J.) pointed out that " [p]ursuant to Article XI-A of the Maryland Constitution, the voters of Anne Arundel County adopted a Charter ... Sec. 308 (a) provides that 'The people of Anne Arundel County reserve to themselves the power known as "The Referendum", by petition to have submitted to the registered voters ... any ordinance or part of any ordinance ....' " Declining to hold Sec. 308 unconstitutional, the lower court expressed the view:

"Nowhere in this section, in the Charter, in an ordinance, in the Maryland Code, or in the Maryland Constitution is there set out any

requirement of publication or other notice of the County's local laws to the electorate so that the electorate may know that there is to be a referendum and have a reasonable chance to find what it is about. This is a fatal flaw. . . . Due process of law 'is not confined to judicial proceedings, but extends to every case which may deprive a citizen of life, liberty, or property, whether the proceeding be judicial, administrative or executive in its nature,' *Ulman v. Baltimore*, 72 Md. 587 (1890), at page 593. The essence of due process is notice. The due process rights of the Complainants are not protected where there is no publication or other reasonable notice provision with respect to a referendum, so that reasonably well-informed voters may be assured. The procedural requirements of a law providing a referendum are mandatory where the attack upon it is made before an election, *Dutton v. Tawes*, 225 Md. 484 (1961). The Respondents can not be made to comply with mandatory procedural requirements with respect to publication and notice when the law affords no procedural requirements. (Even if the rule were substantial compliance, there is no law against which to measure the Respondents' acts to determine substantial compliance.) It follows that the result of the vote of the people of Anne Arundel County on 5 November 1974 on Question D is a nullity." (footnotes omitted).

A decree was entered on December 12, 1974 declaring the result of the vote on "Question D" to be "a nullity and of no effect" and ordering Anne Arundel County to "proceed administratively in accordance with ordinance [No.] 59-73 as enacted."

The County and the Supervisors filed an appeal; the complainant property-owners filed a cross-appeal. While the case was pending in the Court of Special Appeals, we granted certiorari pursuant to Code (1974), Courts and Judicial Proceedings Article, § 12-201.

In support of their contention that the chancellor was in error, the appellants assert that the provisions in Sections 16-6 (a) and (b), 23-1 (a), 8-5 (a) and 2-10 (a) in Art. 33 pertain to the publication and notice of local questions petitioned to referendum by county voters and that those provisions were gratified with respect to "Question D." Alternatively, they argue, should such sections in Article 33 be inapplicable, that actual notice given to the electorate fully satisfied the rights of the complainants to "due process" of law. Collaterally, in urging us "to decide all of the legal issues raised below by the appellees," they argue that the 41 amendments were properly submitted as a single ballot question, that the question as placed on the ballot "was sufficiently fair and informative," that the issue was "properly submissible to the entire county," and that even if the results of the election "down-zoned the complainants' properties," the appellees were not deprived of their property in violation of their constitutional rights. The property owners, in their cross-appeal, point out that the chancellor "did not grant every part of [their] request for declaratory and other relief" and here reassert each of the contentions raised in the trial court.

At the threshold of these questions, we point out that "[t]he Referendum, broadly speaking, is the reservation by the people of a State, or local subdivision thereof, of the right to have submitted for their approval or rejection, under certain prescribed conditions, any law or part of a law passed by the law making body. . . ." *See Beall v. State*, 131 Md. 669, 678, 103 A. 99, 102 (1917), where the history of the right of referendum and the abuses it was designed to abolish were discussed. *See also Board of Education of Frederick County v. Mayor & Aldermen of Frederick*, 194 Md. 170, 177, 69 A. 2d 912, 915 (1949). Ordinarily, a referendum is limited to legislative matters, although the adoption of a charter, charter amendments and local laws authorizing the issuance of bonds or other evidences of indebtedness clearly come within its ambit. Rezoning, pursuant to a comprehensive plan, has been held to be a legislative function. *Board of County Commissioners for*

*Prince George's County v. Edmonds*, 240 Md. 680, 684, 215 A. 2d 209, 211 (1965); *Board of County Commissioners of Prince George's County v. Levitt & Sons, Inc.*, 235 Md. 151, 158, 200 A. 2d 670, 674 (1964). Thus, it would appear — other considerations aside — that legislation, adopting a comprehensive zoning, generically should come within the scope of the right of referendum, to the extent that it might be legally invoked.

In support of the chancellor's reasoning, the property owners basically contend that Section 308 (a) of Article III of the Anne Arundel County Charter, whereby "the people of Anne Arundel County reserve[d] to themselves the power [of] 'The Referendum' " transcends the power authorized by Article XI-A of the Constitution, as well as that contained within the Express Powers Act (Code, (1957, 1973 Repl. Vol.) Article 25A) and is in conflict with Article XVI of the Maryland Constitution, limiting referenda by petition to "any Act, or part of any Act of the General Assembly." From these premises, they argue that the provisions within Article 33, are limited in their application, as they relate to referenda, to those specifically provided for in Article XVI of the Constitution, to charter board questions or proposed charter amendments, both under Article XI-A of the Constitution, and to the borrowing of money or issuing of bonds or other evidences of indebtedness, within the provisions of the Express Powers Act, Article 25A, § 5 (P). Conceding, *arguendo*, the validity of Section 308 (a) of Article III of the County Charter, they further assert that there are no provisions within Article 33 which contain any requirement concerning the publication and notice to be given local ordinances petitioned to referendum. Lastly, they urge that should the provisions of Article 33 be applicable, they were not complied with as to the pre-election publication of notice required for a valid referendum, nor as to the wording of "Question D."

The appellants point out that the chancellor recognized the constitutionality of Section 308 (a) of Article III of the County Charter; that although Article XI-A "neither expressly requires nor prohibits the inclusion of a

referendum provision in the charter of a home rule county, a charter may nevertheless include such a provision," and that upon the adoption of a charter, the right of referendum is implicitly retained in the people with respect to county local laws. From this premise, the appellants contend that the several references within Article 33 to "local questions" and "questions of local concern," clearly demonstrate a legislative intent that the provisions of Article 33 are applicable to the referenda of all local questions, and that these procedural requirements concerning publication and notice were effective in connection with "Question D."

In *Reeder v. Board of Supervisors of Elections*, 269 Md. 261, 305 A. 2d 132 (1973), a case involving the applicability of the residency requirements of Article 33 to an individual, who sought to register to vote in Queen Anne's County on local issues, this Court held that county elections were within the scope of Article 33, and expressly noted that §§ 16-6 (a) and 23-1 (a) were applicable to county certification of questions for the ballot.

Judge Barnes, there writing for the Court, stated:

"The term 'election' is defined by Maryland Code (1957, 1971 Repl. Vol.) Art. 33, § 1-1(a)(6), as follows:

' "Election" means the process by which voters of the State, *or any county* or city thereof, vote for *any* party or public officer pursuant to the laws of this State or the United States, any constitution or constitutional amendment, public law, public act or proposition and unless otherwise indicated *shall include all elections, primary, general, special, local, congressional, presidential, or State-wide. It does not mean any municipal election* other than in Baltimore City unless otherwise specifically provided for in this article.' (Emphasis added)

"This definition includes voters of 'any county' voting for any 'public office' as well as 'local'

elections. The argument of the appellant that county elections are excluded from the scope of Article 33 because they are 'municipalities,' and the only municipality included is Baltimore City, is clearly unsound in view of ᴜne definition and the references in other sections of Article 33 to county elections and local elections. See, *e.g.*, Sections 4A-6 (a) (filing fees); 9-4 (filling local vacancies including county offices); 16-6(a) and 23-1(a) (county certification of questions for the ballot)." (emphasis in original) 269 Md. at 263-64, 305 A. 2d at 134.

See also *County Council v. Montgomery Ass'n*, 274 Md. 52, 333 A. 2d 596 (1975) where Article 33 was characterized as "a comprehensive State Election Code," containing "detailed provisions covering every aspect of the electoral processes in Maryland," and providing for the "administrative supervision of election procedures" and "the administrative supervision of elections on both a state-wide and a local level." 274 Md. at 60-61, 333 A. 2d at 601.

In resolving the question of the applicability of the provisions set forth in Article 33 as they affect a local referendum, it is not necessary for us here to pass upon the efficacy of § 308 (a) of Article III of the Anne Arundel County Charter, and we do not do so. We point out however that in *Levering v. Board of Supervisors of Elections of Baltimore City*, 129 Md. 335, 337, 99 A. 360 (1916), our predecessors implicitly recognized that a provision in the City Charter could provide for the submission of referenda to the local voters, without specific authorization therefor contained in the State Constitution, or an act by the legislature. In *Levering*, the Court, when faced with the validity of the inclusion of a referendum question involving the repeal of a Baltimore City ordinance, which had previously prohibited athletic events on Sundays, decided "that no authority existed, on the part of the Mayor and City Council [of Baltimore], or of the Supervisors of Election, to provide for the submission of the question . . . at the general election of" 1916, because the Mayor and City Council had not received permission from the legislature to submit such

a question to the public, and also, in the alternative to not receiving such legislative permission, that there was "[n]o specific grant of power . . . to refer questions of that nature to the popular vote . . . in the *Baltimore City Charter.*" (emphasis added).

The reasoning in *Levering* was acknowledged in *Scull v. Montgomery Citizens League,* 249 Md. 271, 239 A. 2d 92 (1968), where this Court recognized that by a county charter provision, the people may reserve the right of referendum on public local laws enacted by its local legislative body, created pursuant to Article XI-A of the Constitution. Chief Judge Hammond, there writing for the Court, stated:

> "Section 6 of Art. II of the [Montgomery County] Charter gave a right of referendum, something Art. XI-A does not require in a charter. The people reserved the right to vote on public local laws on specified matters and on '(3) Any other public local law or any part of any other public local law not included under subsections (1) and (2) above.' " 249 Md. at 279, 239 A. 2d at 96.

*See also Harford County v. Board of Supervisors of Elections,* 272 Md. 33, 321 A. 2d 151 (1974), where we noted that "[i]t is not uncommon for people to write into their basic charter a restriction upon the powers of their legislative body." 272 Md. at 39, 321 A. 2d at 154.

Section 16-6 (a) of Article 33 provides "[t]he ballots shall contain a condensed statement in understandable language of every constitutional amendment or other question to be submitted to the vote of the people at any election. It shall be sufficient in any case to print the legislative title, [or] a brief summary of the contents or purpose of the proposed amendment or referendum unless the act proposing the constitutional amendment or other question specifically provides the title to be used." The subsection further provides, in pertinent part, that the Secretary of State "shall prepare and certify the form in which a constitutional amendment or question shall appear . . .," and that "[t]he county commissioners, *county council,* or treasurer of

Baltimore City, as the case may be, *shall prepare and certify to the boards* [of election supervisors] *the form in which local questions shall appear* on the ballot . . ." (emphasis added). The subsection additionally provides that "[i]n the event [that] the title of the bill, *ordinance* or resolution, as the case may be, is one hundred words or less, the title shall be sufficient. In the event the title exceeds one hundred words, a summary of the title containing not in excess of one hundred words shall be prepared and certified [by the county commissioners, county council or treasurer of Baltimore City] to the boards." (emphasis added).

Section 16-6 (b), as amended by Chapter 328 of the Laws of 1974, provides, in pertinent part, that "[l]ocal questions or referenda shall be designated by successive letters of the alphabet, rather than numerically. The county council, county commissioners or the treasurer of the City of Baltimore shall designate the alphabetical order of local questions or referenda." [7]

Section 23-1 (a) of the Article, as it pertains to the certification of questions, provides in pertinent part, that . . . "[i]f *questions of local concern* are to be submitted for approval to the vote of the people of a county or a municipality the same shall be certified to the boards [pursuant to Section 16-6] within said period [on or before the fourth Monday in July] by the county commissioners, *county councils* or treasurer of the City of Baltimore, as the case may be, and *shall be advertised as herein provided* [by Section 8-5] *in the case of nominees for county or city offices.*" (emphasis added).

Section 8-5 (a) of Article 33, relating to the advertisement or publication of nominees provides that "[a]t the time of giving the notice of election required by § 2-10 [(a)] of this Article, each board shall cause to be published by one insertion in two or more newspapers published within each county, . . . the nominations to office which have been filed

---

7. The Title of Chapter 328 of the Laws of 1974, which amended Article 33 § 16-6 (b) reads: "For the purpose of requiring that the order *of local questions* or referenda be designated on ballots by letters of the alphabet rather than numerical." (emphasis added).

with or certified to them under the provisions of this article. . . ."

Section 2-10 (a), as amended by Chapter 190 of the Laws of 1974, provides that "[i]n the *counties*, each board shall give notice during the calendar week preceding any election of the time and place of the election by advertisements, . . . in at least two newspapers of general circulation published in the county. . . ." (emphasis added).

Section 23-9 of Article 33, expressly applicable to those elections "at which laws are to be submitted to the voters under the provisions of Article XVI of the State Constitution," requires the publication in newspapers of general circulation of the *text* of such measures.

Since county and local elections have been held to come within the purview of Article 33, and that Article has been held to cover "every aspect of the electoral processes in Maryland" and election procedures, on both a state-wide and local level, we think it clear — assuming the validity of § 308 of Article III of the Anne Arundel County Charter — that referenda questions, including the approval or rejection of legislation enacted by county councils, in charter counties, come within the embrace of the procedures specified in that Article. Even though the Article contains no express reference to such a referendum, such a conclusion emanates from a reading of §§ 16-6 (a), 23-1, 23-2 and §§ 23-3 through 23-10.

In § 16-6 (a), mandating that ballots "contain a condensed statement in understandable language" of every question "to be submitted to the vote of the people at any election," the legislature clearly recognized that local officials, as distinguished from the Secretary of State, "shall prepare and certify" the form in which such local questions shall appear on the ballot. The section also significantly refers to "bill[s], ordinance[s] or resolution[s]," terms not customarily used in describing enactments of the General Assembly. Whereas § 23-1 (b) and § 23-2 each expressly refers to "[q]uestions arising under Article XIA of the Constitution of Maryland" (pertaining to charters), and §§ 23-3 through 23-10 expressly refer to petitions filed pursuant

to Article XVI of the Constitution, there is no such restriction in the language used in § 23-1 (a), where reference is freely made by the General Assembly to "questions of local concern . . . to be submitted for approval to the vote of the people of a county, [etc.,]" without in any way modifying the nature of those "questions of local concern." We think that by such delineation and the express language used, the General Assembly clearly undertook to separately identify those referenda, arising pursuant to Articles XI-A and XVI of the Constitution, from those arising upon "local questions," "questions of local concern" and "ordinances," and thereby clearly showed an intent, to bring within the embrace of the procedures specified in Article 33, the submission of such local questions as may be properly subject to a referendum.

Contrary to the views expressed by the chancellor, we conclude that the "requirement of publication or other notice of the County's local laws to the electorate so that the electorate may know that there is to be a referendum and have a reasonable chance to find what it is about," is supplied by the provisions in §§ 23-1 (a), and 16-6 (a) of Article 33, and the interplay of those sections with § 8-5 (a), as the latter relates to the advertisement of "questions of local concern," as in the case of nominees for county offices. Though we disagree with the chancellor's *ratio decidendi,* we shall, upon reasons to be herein set forth, concur in the conclusion reached by the lower court when it declared the results of the referendum on "Question D" to be "a nullity and of no effect."

The County Council purportedly acted pursuant to §§ 16-6 (a) and 23-1 (a), when it prepared the form and contents of the referendum question and certified it to the Supervisors; in accordance with § 16-6 (b) the Council designated the question alphabetically as "Question D;" the Supervisors accepted the question, as certified, as a ballot item on the voting machines, after deleting the words "THE AMENDMENTS TO THE BILL," as submitted with the Question. The Supervisors then undertook to act pursuant to § 23-1 (a), as "in the case of nominees for county offices," as

provided in §§ 8-5 (a) and 2-10 (a) when, during the calendar week preceding the election, they caused advertisements to be published in the four newspapers within the county. Such advertisements however did no more than publish the "make-up" of the question, as certified by the Council, and as it was to appear on the voting machines as "Question D." It was conceded that at no time, nor in any manner, was either the text of ordinance No. 59-73, or the text of its 41 amendments, ever published.[8] (*See* Article 33, § 23-9, requiring the publication of the *text* of those enactments by the General Assembly brought to referendum under the provisions of Article XVI of the Constitution). The critical issues however, as we see them, concern a compliance with the provisions of § 16-6 (a) as to the wordage of "Question D" and whether the advertisements, limited to the verbiage of the question, gratified the requirement of sufficient notice by publication to the electorate as contemplated by § 23-1 (a).

Presupposing, without deciding, (a) that a comprehensive zoning ordinance, or a portion thereof, may be the proper subject of a petition for referendum, (b) that such a referendum may be limited to the amendments to such an ordinance, without recitation of the provisions in the ordinance to which the amendments apply, (c) that 41 separate amendments, affecting property in different locations, may be combined to form a "single question" on referendum, and (d) that a referendum may be submitted to the voters of the entire county though its subject-matter is limited to properties within one tax assessment district, we shall limit our decision to an appraisal of the wording of "Question D" as it was submitted to the voters on the ballot, and whether or not its publication, by advertisements, prior to the election, permitted, in a meaningful manner, an intelligent decision, by an average voter, when he exercised

---

8. Assuming that the provisions in § 308 (a) of Article III of the Anne Arundel County Charter, whereby the people reserved to themselves the power of referendum, and the provisions of Article XVI, Sec. 1 (a) of the Constitution, wherein the people reserved to themselves the same power as to State legislative enactments, are analogous.

his choice, in voting either "FOR" or "AGAINST" "Question D."

In its appraisal of compliance with the notice requirements contained in Article 33, this Court has clearly recognized the distinction between the effects of the failure to conform with such provisions when raised in pre-election litigation, as compared with the effect to be given those same provisions, when not strictly followed, and when challenged by litigation attacking the results of an election. In *County Commissioners of Montgomery County v. Henderson,* 122 Md. 533, 89 A. 858 (1914), a case involving a pre-election challenge to a special election to determine the question of a special levy and county bond issue for public improvements, this Court held that "[t]he provision of the statute, as to notice . . . is mandatory and not merely directory," that "[a]ll of the conditions prescribed should be strictly observed, because they are equally essential to the authority attempted to be conferred," and that "[t]he effect of statutory requirements in cases of this kind as to time of notice by publication . . . and the terms of such provisions must be strictly complied with . . ." 122 Md. at 537, 89 A. at 859-60. Finding that the publication of the proposed ballot question was not in accordance with the requirements of the statute and a fatal defect, it was held that an injunction had properly issued enjoining the appellants from holding the special election. In *Dutton v. Tawes, supra,* Chapter 739 of the Acts of 1957 (then codified as Article 33, § 170) provided that the text of a referred law be published by "at least . . . one insertion in two or more newspapers within the several counties of the state and in all the daily newspapers published in Baltimore City . . ." Overlooking the requirements of that section, employees of the office of the Secretary of State undertook to follow the provisions set forth in former § 208 of Article 33, as enacted by Chapter 335 of the Acts of 1941, and published the referred law (a compact with the State of Virginia relating to the Potomac River) but once, in one newspaper, the *Baltimore Sun,* having a general circulation throughout the state. The text of a number of proposed constitutional amendments, also

voted on in the same election in 1960, were published in 53 county newspapers and in three Baltimore City newspapers. In holding that statutes, giving direction as to the mode and manner of conducting an election, are generally construed as directory when considered after an election, unless the deviation had a vital influence upon the election, Judge Hammond, writing for the Court, stated:

> "The Maryland cases, like those elsewhere, have held that there is a clearly recognized difference between the effect given to modal provisions of the election laws before election and the effect of the same provisions after election. Election officials of course should do what the law tells them to do and, before election, a court will require that they do their duty. Yet if the election has been held *before court action is sought and it is not shown that the failure of the officials to follow the law has interfered with the full and fair expression of the will of the voters, that expressed choice will not be disturbed by the Courts. Wilkinson v. McGill*, 192 Md. 387, 393; *Graham v. Wellington*, 121 Md. 656, 661; *Seyboldt v. Mayor & C. C. of Mt. Ranier*, 130 Md. 69, 73; *Carr v. Town of Hyattsville*, 115 Md. 545, 549-550. The latest statement of the rule in this Court was in *Lexington Park Volunteer Fire Department, Inc. v. Robidoux*, 218 Md. 195, 200: 'It is generally held that an election which has been honestly and fairly conducted will not be vitiated by mere failure to follow the statute precisely unless the result is shown to have been affected or the statute expressly states that such failure renders the election void. *After the election is held, statutes giving direction as to the mode and manner of conducting it are generally construed as directory, unless the deviation from the prescribed forms of the law had so vital an influence as probably to have prevented a free and full expression of the popular will.* The courts reason that it would be unjustifiable to defeat the

expressed will of the electorate if the irregularity did not frustrate or tend to prevent a free expression of the electors' intention or otherwise mislead them.'" (emphasis added) 225 Md. at 491-92, 171 A. 2d at 690-91.

Since in *Dutton* the litigation instituted sought to enjoin the governor from proclaiming that the compact had been adopted by the electorate in the referendum, this Court, in a post-election review, held that the provisions in then § 170 of Article 33 were "directory," and "that the record shows there was substantial, if not full, achievement of the purpose of the statute to acquaint the electorate fully with the law involved, and nothing to show that the deviation from the prescribed mode of acquainting, misled the voters or prevented, frustrated or interfered with a free, full and intelligent expression of the popular will." 225 Md. at 493, 171 A. 2d at 691. In reaching this conclusion, the Court pointed out that wide-spread publicity had been given the compact question in both news articles and editorials, that numerous radio and television news broadcasts, including a purchased television program, had related to the proposed compact and that the official specimen ballot, which in fact contained a brief and accurate summary of the statute, had been published in 53 county newspapers and in three Baltimore City papers.

*See however Graf v. Hiser,* 144 Md. 418, 125 A. 151 (1924) where, in a suit filed after an election, the results were set aside because "there was a serious defect in the notice which the act made a prerequisite to the election . . .," because there was "not a substantial compliance with that essential condition precedent . . ." and because the mistake "in the preparation of the notice, and in the reception and exclusion of votes, had a probably decisive influence upon the election." The deviation from the terms of the statute was there held to be "of such consequence as to fully justify the view that the election ought to be treated as a nullity." 144 Md. at 421, 125 A. at 152.

The complaint here was filed by the property owners 32

days before the scheduled referendum, and the case was at issue before the election. Since the lower court, pursuant to our holdings in *Tyler v. Secretary of State, supra,* in continuing the case for trial to a post-election date, preserved the issues "as if heard and decided prior to the election," and adjudicated the matter as if tried prior to the election, we shall make our appraisal of compliance with the modal provisions in §§ 16-6 (a) and 23-1 (a) of Article 33 in the same context.

Article 33, § 16-6 (a), in addition to stating that "[t]he ballots shall contain a condensed statement in understandable language of every constitutional amendment or other question to be submitted to the vote of the people at any election," further provides that "[i]t shall be sufficient in any case to print the legislative title, [or] a brief summary of the contents or purpose of the proposed amendment or referendum unless the act proposing the constitutional amendment or other question specifically provides the title to be used." Additionally, the section sets forth that: "In the event the title of the bill, ordinance or resolution, as the case may be, is one hundred words or less, the title shall be sufficient. In the event the title exceeds one hundred words, a summary of the title containing not in excess of one hundred words shall be prepared and certified to the boards."

In discussing "the sufficiency of the legend used on the ballot" in a referendum, our predecessors pointed out, in *Lexington Park v. Robidoux,* 218 Md. 195, 146 A. 2d 184 (1958), in interpreting the language in Code (1957) Article 33, § 94 (i) — the forerunner of § 16-6 (a) — that "it is sufficient to print on the ballot the legislative title *or* a brief summary of either the contents or purpose of the proposed amendment or referendum 'unless the act proposing the constitutional amendment or other question specifically provides the ballot title to be used.'" (emphasis added) 218 Md. at 199-200, 146 A. 2d at 186. Where a legislative title is used as the ballot question, the prescriptions of Article III, § 29 of the Constitution, concerning the sufficiency of the title, come into play and the title-ballot question must embrace one

subject, fairly apprise the voters of the purpose of the act, not be misleading and not calculated to lead the public to believe that the proposed legislation is substantially different from that which would actually become law under the statute. *See Morris v. Governor,* 263 Md. 20, 281 A. 2d 216 (1971); *Allied American Mutual Fire Insurance Co. v. Commissioner of Motor Vehicles,* 219 Md. 607, 614-15, 150 A. 2d 421, 426 (1959); *Dinneen v. Rider,* 152 Md. 343, 357, 136 A. 754, 759 (1927). Where however the ballot question used is not the legislative title but a brief summary of the contents or purpose of the proposed act, the standard by which the question's validity will be judged, as with a legislative title, is whether the question posed, accurately and in a non-misleading manner, apprises the voters of the true nature of the legislation upon which they are voting. *See Morris v. Governor, supra,* where the Court "using the tests of the sufficiency of legislative titles" found that the ballot titles prepared by the Secretary of State and not by the General Assembly, as to eight amendments to the Constitution, were adequate and not misleading. 263 Md. at 27, 281 A. 2d at 219.

In two cases involving post-election challenges to referenda, where the ballot questions did not use the legislative titles, but undertook to put forth a brief summary of the contents and purposes of the respective legislation, this Court upheld the results of the referenda, finding that, although the exact titles of the bills had not been published, the questions contained concise statements concerning their nature and purpose, and that the electorate had been adequately advised, from the wording of the question, as to their elective choice. *See Lexington Park v. Robidoux, supra,* (where "[t]he supervisors of election did not print the title of the act on the ballot but substituted the words 'Fire Tax Referendum', but otherwise followed the directions of the Act, . . ."). After pointing out that "the course followed in the preparation of the ballots was a substantial compliance with the statutory provisions . . ., that failure to follow strictly the prescribed directions did not affect the validity of the election," and that the case was being reviewed after

the results of the election, Judge Hammond, writing for the Court, stated:

> "The heart of the title was contained in these words: ' * * * relating to the levy of a special fire tax in St. Mary's County and providing for a referendum thereto'. Printed on the ballot was the essence of the heart of the title, namely, 'Fire Tax Referendum' and the words for or against 'the Fire Tax'. We think it is clear that the voters of the Eighth Election District of St. Mary's County knew what they were voting for or against and that the failure to follow strictly the direction of the act in the preparation of the ballot had no effect upon the fairness or the result of the election." 218 Md. at 201, 146 A. at 187.

*See also Carr v. Mayor and City Council of Hyattsville,* 115 Md. 545, 81 A. 8 (1911) (where the act directed that the ballots "should have printed on them 'For the Act to Improve the Streets' and 'Against the Act to Improve the Streets,'" but where the ballots actually read " 'For the Road Bill' and 'Against the Road Bill' "). Our predecessors in *Carr,* also noting that the matter was being adjudicated after the referendum, pointed out that "[i]t is not alleged that the voters were deceived, misled or confused by the form of the ballot as actually prepared." 115 Md. at 548, 81 A. at 9. In concluding that "[t]he voters undoubtedly knew they were voting upon the question of approval or disapproval of the act" and that the "object which the legislature had in view had been gratified," Judge Burke, for the Court, reasoned: "The Legislature did not expressly declare that the use of the prescribed form of ballot was essential to the validity of the election, nor does it appear from any facts stated in the bill that the omission to use that form of ballot [suggested by the Legislature] in any way affected the actual merits of the election." 115 Md. at 551, 81 A. at 9-10.

The County Council in this case patently made no attempt to certify, as the ballot question, the title of the basic zoning

ordinance, or the titles of any of the separate 41 amendments. Nor was any attempt made to summarize those titles by a statement "not in excess of one hundred words" as "Question D." In attempting to gratify the requirement in Article 33, § 16-6 (a) that the Question submitted be "a brief summary of the contents or purpose of the proposed . . . referendum," the proposition submitted to the voters asked them to vote "FOR" or "AGAINST" the "*rezon[ing]* of certain parcels . . . in the median strip, the west side of the southbound lane and the east side of the northbound lane of Route 3; and to *rezone one parcel* on the west side of Brockridge Road [in Laurel] . . . ; *all parcels* of which are in the Fourth Assessment District and which were *rezoned by virtue of amendments* to Bill No. 59-73." (emphasis added). Although as originally submitted, "Question D" provided for the voters to choose to vote either "FOR THE AMENDMENTS TO THE BILL" or "AGAINST THE AMENDMENTS TO THE BILL," as the Question appeared on the voting machines, their choice was limited to a vote "FOR" or "AGAINST" "*rezoning.*"

The general word "rezone," as used in the proposition, obviously had a psychological appeal to those who consider such term as connoting a detrimental change in the current and visible use of property. Nowhere in "Question D" is there any indication of the nature of such "rezoning." As conceded by counsel for the appellants in argument, from the wording of "Question D" one is unable to tell whether such "rezoning" up-graded or down-graded the zoning uses. As earlier pointed out, the respective 41 amendments adopted at least five distinct zoning classifications — C2 (Commercial, office), C3 (General Commercial), C4 (Highway Commercial), W1-B (Industrial Development) and C1A (Neighborhood Commercial) (for the parcel located in Laurel). In fact, none of the 41 amendments undertakes to "rezone" those tracts of land to which they apply. While the zoning proposed by the original ordinance contemplated a "down-zoning" from existing commercial uses to classifications of R1 (Residential), RA (Residential Agricultural) and W1-B (Industrial Development), each of

the amendments undertook basically to negate those proposed zoning changes and to continue in effect the zoning uses which the subject properties already enjoyed under former zoning ordinances and maps.

"Question D" gave no indication of the location, along the 10-mile length of the median within Route 3, as to how many of the affected "certain parcels of land" (42 tracts) were within the median, or how many abutted the outside boundaries of the dual lanes of Route 3. Only "one parcel" of land on the west side of Brockridge Road . . ." (in Laurel) was pinpointed. No one reading the proposition could learn that only 41 of the 145 amendments, enacted to the ordinance, were encompassed within the Question, nor that amendments, creating industrial and commercial uses for a number of properties along both sides of Route 3, not petitioned to referendum, were not within the subject-matter the voters were called upon to decide.

The use of the term "certain parcels," without delineating the location of the properties within the referendum, in the factual background of the case created an additional ambiguity, since, as we understand it, every amendment affecting parcels within the median — except that of the J. F. Johnson Lumber Co. — was included in the referendum.

No voter, when confronted with "Question D," could know that there had been two amendments (Nos. 96 and 36) affecting the extensive, commercial, lumber-yard facilities of the J. F. Johnson Lumber Co. located within the median, each of which created for such facilities a C4 (Highway Commercial) classification, nor know that although amendment No. 96 was within the ambit of "Question D," amendment No. 36, not petitioned to referendum, had become law and that that property had been effectively zoned as C4, prior to the referendum.

The County Executive's solicitation, addressed to each taxpayer within the County, exhorting a vote against "Question D," certainly obfuscated the issue. His "voter's card" suggested that the ballot question was limited solely to properties *within the median* strip on Route 3; that a "No" vote should be registered "in order to stop *any further*

commercial development in the middle of this highway," and that to vote otherwise would allow "service stations, fast food stores and other strip commercial uses *to locate* in the middle of this Highway." Without doubt, each of the voters receiving this campaign literature from the chief executive officer of the County, had his attention directed to that portion of the median where "fatal accidents and serious injuries" had occurred. Quite deceptively, his statement did not apprise such voters that the amendments brought to referendum did, in fact continue existing commercial uses within the full length of the median, and failed to acquaint them with the fact that the referendum question embraced properties abutting the dual lanes on Route 3, as well as one parcel, 10 miles distant.

As we see it, "Question D," as it appeared on the voting machines, and as it was advertised, in calling upon a voter to make a choice either "FOR" or "AGAINST" the "rezoning" of "certain parcels" within the Fourth Assessment District, did not present a clear, unambiguous and understandable statement of the full and complete nature of the issues undertaken to be included in the proposition.[9]

Although the wordage used to frame "Question D" can surely be said to be "condensed," the summary designed did not set forth, "in understandable language," "the contents and purpose of the proposed" referendum with that clarity and objectivity required to permit an average voter, in a meaningful manner, to exercise an intelligent choice. Thus, upon our analysis, we conclude that the provisions in Article 33, § 16-6 (a), concerning the "make-up" of "Question D," were not gratified; nor did the advertisements publicizing it comply with the obvious intent and purpose of § 23-1 (a).

---

**9.** Some voters may have wished to vote in favor of those zoning changes made by one or more of the 41 amendments and against the remainder; some voters, following the urging of the County Executive, may have wished to vote against those amendments affecting the parcels within the median; some voters may have been against amendment No. 73, permitting the continuation of a grocery store and printing shop, on the tract in Laurel, and in favor of a continuation of the zoning uses then in effect within and along Route 3 — or vice versa. A great number of combinations of voters' choices can be visualized as being within the ambit of "Question D," as the voters were presented with it and called upon to make a choice.

Courts in other jurisdictions which have passed upon ballot questions which did not fairly and accurately present a statement of the question to be decided, have reached similar results.

The holding in *Markus v. Trumbull County Board of Elections*, 22 Ohio St. 2d 197, 259 N.E.2d 501 (1970) seems here to be particularly apposite. In that case, the appellees filed an application for a zoning change requesting a zoning classification from "residential" to "business and commercial" for property owned by them in Trumbull County. In opposition to this rezoning, certain of the appellants then obtained the required number of signatures to place the matter on referendum. Prior to the appellee's application, a portion of their property had been zoned "business and commercial," while the remainder was zoned "residential." Similar to the provisions in Article 33, § 16-6 (a), the Ohio Statute (R.C. 3505.06) provided that "[a] condensed text that will properly describe the question, issue, or amendment shall be used as prepared and certified * * * by the board for local questions or issues." The ballot question submitted to the board read as follows: "Shall the following described premises be amended from residential to business and commercial," and undertook to describe the entire property.

The Ohio Supreme Court, in affirming the declaration by the trial court that the proposed ballot was "null and void," as "insufficient, ambiguous and misleading," stated:

> "The ballot described the entire property owned by the appellees and in no way indicated that part of the property was presently zoned for business and commercial use, and that the zone change was merely an *increase* in the size of the business and commercial zone.
>
> "In holding the condensed text on the ballot to be insufficient, ambiguous and misleading to the average citizen who might be affected thereby, the trial judge stated:
>
> > 'The ballot must be complete enough to convey an intelligent idea of the scope and

import of the amendment. It ought not to be clouded by undue detail as not to be readily understandable. It ought to be free from any misleading tendency, whether of amplification, or omission. It must in every particular be fair to the voter to the end that intelligent and enlightened judgment may be exercised by the ordinary person in deciding how to mark the ballot.

'The ballot should be in proper form so that the voter may have at hand some means for making up his mind whether to approve or disapprove the issue.'

"A ballot statement drawn pursuant to a referendum petition is crucial to the integrity of the constitutional safeguard of referendum. It is only from the ballot statement that the ultimate deciders of the question can arrive at an efficacious and intelligent expression of opinion. The ballot must fairly and accurately present a statement of the question or issue to be decided in order to assure a free, intelligent and informative vote by the average citizen affected." (emphasis in original) 22 Ohio St. 2d at 202-03, 259 N.E.2d at 504.

A similar view was expressed by the Supreme Judicial Court of Massachusetts in *Sears v. Treasurer and Receiver General*, 327 Mass. 310, 98 N.E.2d 621 (1951), where, in discussing the requirement, in its constitution, that a question submitted to the electorate by the initiative process must set forth a "fair, concise summary" of the law to be adopted, stated:

"[T]here must be a real 'summary.' A summary is an abridgment, abstract, compendium, or epitome. The word carries with it the idea that, however much the subject matter may be condensed, the sum and substance of it must remain. No doubt details may be omitted or in many instances covered by broad generalizations, but mention must

be made of at least the main features of the measure. And the summary must be 'fair'; that is to say, it must not be partisan, colored, argumentative, or in any way one-sided, and it must be complete enough to serve its purpose of giving the voter ... who is present in a polling booth a fair and intelligent conception of the main outlines of the measure. It must do more than merely indicate the field of human or governmental activity within which the measure falls. ..." 327 Mass. at 324, 98 N.E.2d at 631.

The view expressed in *Sears, supra,* that "[t]he voters [are entitled] to rely upon the statement in the ballot prepared and given to them" was followed in *Mayor of Gloucester v. City Clerk of Gloucester,* 327 Mass. 460, 464, 99 N.E.2d 452, 455 (1951) in holding that a referendum vote for establishing a form of government for the City of Gloucester was a nullity.

In accord with these views are *Troland v. City of Malden,* 332 Mass. 351, 125 N.E.2d 134 (1955); *Turner v. Barnhart,* 83 N.M. 759, 497 P. 2d 970 (1972) and *State Ex rel. Fleck v. Dalles City,* 72 Ore. 337, 143 P. 1127 (1914).

Particularly noteworthy here is the decision by the Court of Common Pleas of Ohio (for Cuyahoga County) in *Russell v. Linton,* 52 Ohio Op. 228, 115 N.E.2d 429 (1953), where a village council rezoned certain lands, including that of the plaintiff, for industrial uses. A petition for referendum was rejected as defective. Those who had unsuccessfully sought the referendum then filed a petition for initiative. The proposed ordinance was to re-zone the area so classified as industrial and return it to the classification which existed prior to the council action. In holding that the question might properly be certified for an initiative election, that court stated:

"This now brings us to the consideration of the objections that the proposed ordinance is ambiguous and misleading and contains multiple subjects in its title and text. The obvious conclusion

would be, that if these handicaps existed in the ordinance, the voters could not intelligently determine upon what subject they were voting. A reading of the ordinance clearly indicates a plain intention to undo the act of the village council in rezoning certain lands and to place such lands back into a classification formerly controlling them. Certainly the voters would know the issue presented: Vote 'Yes' to re-zone the area for single family residences: Vote 'No' to retain the zoning for manufacturing purposes. It seems to be as simple as that." 52 Ohio Op. at 231, 115 N.E.2d at 432.

The question submitted in *Russell v. Linton, supra,* clearly and explicitly designated the choice submitted to the voters, as contrasted to the issue here submitted to them by "Question D." In our case, "Question D," as framed, did not permit a voter to know whether the existing zoning on the properties, subject to the amendments, would be changed, or remain the same, nor did it, in any way, suggest the nature of any of the "rezoning." *Compare Lexington Park v. Robidoux, supra.*

Notwithstanding the deficiencies we have found in our analysis of the composition of "Question D," and the shortcomings attending the notice thereof by its advertisement, the appellants, relying on the post-election decisions in *Dutton v. Tawes, supra,* and citing *Morris v. Governor, supra* and *Lexington Park v. Robidoux, supra,* contend that "pre-election publicity was so extensive that there can be no question that the electorate was sufficiently informed with respect to the issue raised by 'Question D.'" They cite testimony that the Office of Planning and Zoning publicized the notices of the hearings it conducted in 1973, that as many of the affected property owners as could be notified were advised of the contemplated changes in their zoning classifications and that these meetings had been "actively attended;" they refer to the testimony concerning the attendance at a number of meetings, conducted in June, July and August, 1973, when the County Council held public hearings on Bill No. 59-73; they additionally call attention to

the publication of the "sample ballot" in the League of Women Voters' newspaper and the sheaf of newspaper clippings, produced through the County Publication Officer, purporting to set forth the publicity given in the press to the subject-matter of the comprehensive zoning ordinance and its amendments. The trial court indicated that it was deciding the case as if it were being tried "[on] November 4, 1974, the day before the General Election," pursuant to the holdings in *Tyler v. Secretary of State*, 230 Md. 18, 185 A. 2d 385 (1962); it noted that although it had "admitted the County's exhibits with respect to the notoriety given to 'Question D', it will ignore those exhibits [in its decision]."

Although we have reviewed this case in the same posture and context in which the trial court considered it, as a pre-election challenge to the validity of "Question D," and its publication by advertisement, and thus have been required to consider the requirements of Article 33, §§ 16-6 (a) and 23-1 (a) as mandatory, rather than directory, we have nonetheless reviewed the evidence offered by the County in support of its claim of the notoriety given the referendum proposition.

As we see it, the attendance by property owners affected by the zoning ordinance, at three meetings conducted by the Office of Planning and Zoning, prior to July, 1973 — at a time when the amendments were not even conceived — can, in no way, be considered a substitute for the publication of the "contents and purpose" of the referendum. Nor do we see how attendance by interested parties at meetings of the County Council during July and August, 1973 — 15 months before the election — can constitute a substitution for the notice required to be given the electorate at-large of a ballot question to be voted upon in the 1974 General Election.

Of the 53 newspaper clippings submitted, dating from September 21, 1972 to October 31, 1974, only four were published within the year 1974 — two dated July 18, 1974 and another two on October 31, 1974. It would similarly appear that news articles published during 1973 in connection with the proposed ordinance, the meetings thereon, the 145 amendments adopted by the Council, the

Executive's veto of 87 of them and the Council's override of 57 of the vetoes, would not continue to have any informative viability in November, 1974, in apprising the voters of the nature of the question they were called to vote upon in "Question D." An *Evening Sun* account of October 31, 1974, devoting five-and-one-half columnar inches to "Question D," gave more space to a discussion of this litigation than it did in an attempt to explain the nature of the Question.[10] One of the news articles, published in the *Evening Capital* on July 18, 1974, stated that a "Yes" vote "would indicate the voter approves of the Council's action," whereas a "No" vote "indicates the voter approves of the Administration's action."

The handout, *Issues and Candidates — '74*, distributed by the League of Women Voters, after setting forth "Question D" verbatim on page 15, undertook, in four columnar inches, a simplistic analysis of the Question. It stated basically that if the Question passed "74 acres within the median strip *will become* commercial," although it pointed out that two or three such parcels "did not receive commercial zoning from the County Council." It further reported that "if the amendments are rejected, the median strip will be zoned R1 and there will not be an *increase* of Commercial or Industrial Park zoning along either side of Rt. 3." To the extent that the pamphlet was reasonably informative to those voters who "picked-up" a copy, it was certainly offset and counteracted by the solicitation mailed by the County Executive to every taxpayer in the County; it cannot be construed as substituted notice to the voters.

Patently, such sparse, incomplete and generally outdated publicity, in no manner — either in accuracy or intensity — approaches the nature of the publicity found to have been

---

10. A proffered exhibit of an article published in the *Anne Arundel Times* on October 31, 1974, quoted the Director of Planning and Zoning as stating that the property of one of the appellees, Jesse Scruggs and his wife, had in fact retained a C4 commercial zoning for their heating and fuel company property at Millersville, fronting on the west side of Route 3, when in fact the Scruggs' property, which had been proposed for an R1 classification, had been classified as C4 by amendment No. 68, which was included among the 41 amendments petitioned to referendum.

given in *Dutton v. Tawes, supra,* where a fair and accurate summary of the statute, as the ballot question, had indeed been published in 53 county newspapers and in three Baltimore City publications, immediately prior to the conduct of the election. Additionally, our evaluation of this newspaper evidence submitted by the County, convinces us that it falls far short of being in any manner sufficient, in its factual discussions of "Question D" to adequately and informatively apprise the voting public of their elective choice, or the practical effect of a vote "FOR" or "AGAINST" "Question D."

Even if we were to review this case as one where the litigation was instituted after the election, and thus consider the provisions in Article 33, §§ 16-6 (a) and 23-1 (a) as being merely directory, we still could not, based upon the nature of the pre-election publicity, uphold the validity of the referendum. We are convinced that the failure of the ballot question to present a clear, unambiguous and understandable statement of the full and complete nature of the issues included in "Question D," coupled with the advertisements, limited as they were to a verbatim statement of the Question, constituted a "deviation from the prescribed forms of the law [and] had so vital an influence as probably to have prevented a free and full expression of the popular will." *Dutton v. Tawes,* 225 Md. at 491, 171 A. 2d at 691; *Tyler v. Secretary of State,* 230 Md. at 22, 185 A. 2d at 387; *see also Graf v. Hiser,* 144 Md. at 421, 125 A. at 152.

Under the facts here, we endorse the view expressed in *Markus v. Trumbull County Board of Elections, supra,* that the ballot statement of "Question D" was "crucial to the integrity of the constitutional safeguard of [the] referendum," as it applied to the notice required to be given the electorate, since it was only from its make-up "that the ultimate deciders of ["Question D" could] arrive at an efficacious and intelligent expression of [their] opinion." Applying that test, and the view there stated, that the voter must have "at hand some means for making up his mind whether to approve or disapprove [that] issue," we conclude that "Question D," both as it was stated on the voting

machines, and as it was advertised prior to the election, was so inaccurate, ambiguous and obtuse, that an ordinary voter, of average intelligence, could not, in a meaningful and comprehending manner, have knowledgeably exercised his franchise when called upon to vote either "FOR" or "AGAINST" that question.

It is for these reasons, that we concur with the chancellor's decision, that the results of the referendum on "Question D" be declared a "nullity and of no effect."

> *Decree affirmed; costs to be paid by the appellant, cross-appellee, Anne Arundel County, Maryland.*

*Singley, J., concurs in the result.*

*Levine, J., dissenting:*

It is the opinion of the majority that the vote on Question No. D, referred to the voters of Anne Arundel County at the November 1974 general election, must "be declared a 'nullity and of no effect' " because the language of the question as it appears on the ballot failed to satisfy the requirements of the Election Code, specifically § 16-6 (a) of Maryland Code (1957, 1975 Cum. Supp.), Art. 33, pertaining to the form of the ballot title.[1] While I concur with the majority in finding Article 33 applicable to local questions petitioned to referendum by county voters, I cannot agree that the ballot title in question failed to satisfy the requirements of § 16-6 (a), and I therefore respectfully dissent.

Section 16-6 (a) provides generally that in the case of a referendum, "[t]he ballots shall contain a condensed statement in understandable language of every con-stitutional amendment or other question to be submitted to the vote of the people at any election." It is further stated

---

1. The majority, somewhat obliquely, indicates a failure to comply with § 23-1 (a), which pertains to the noticing of local questions, as well. It appears, however, to be the position of the majority that had the ballot title satisfied the requirements of § 16-6 (a), notice of the election by publication of the proper ballot title would have satisfied the requirements of § 23-1 (a). Since I find the ballot title to be in compliance with § 16-6 (a), I therefore conclude that publication of that ballot title satisfied the notice requirements of § 23-1 (a).

in § 16-6 (a), in prescribing the proper form for questions referred to the voters, that "[i]t shall be sufficient in any case to print the legislative title, a brief summary of the contents or purpose of the proposed amendment or referendum . . . ." In the instant case the legislative title was not employed in formulating the ballot title, but instead what appeared on the ballot was "a brief summary of the contents or purpose" which the majority finds wanting.

Because § 16-6 (a) permits the use of the legislative title, in assessing the sufficiency of a summary of the purpose or contents of the question constituting the ballot title, the test for sufficiency of legislative titles may be used. *Morris v. Governor*, 263 Md. 20, 27, 281 A. 2d 216 (1971). Thus, if the summary of the contents or purpose of the question meets the test for sufficiency of a legislative title, the requirements of § 16-6 (a) are satisfied.

Similar purposes are served by a ballot title and by a legislative title. The purpose of each is to assure that the public is fairly advised of the nature of pending legislation. *Neuenschwander v. Wash. San. Com.*, 187 Md. 67, 79, 48 A. 2d 593 (1946); *State v. Norris*, 70 Md. 91, 95-96, 16 A. 445 (1889). To fulfill that purpose it is not necessary that the title give an abstract of the act, but only that it fairly indicate the subject of the legislation. *Dutton v. Tawes*, 225 Md. 484, 499, 171 A. 2d 688, *appeal dismissed*, 368 U. S. 345 (1961); *Pressman v. State Tax Commission*, 204 Md. 78, 92, 102 A. 2d 821 (1954); *Painter v. Mattfeldt*, 119 Md. 466, 474, 87 A. 413 (1913).

Referendum Question No. D, as it appeared on the ballot, fairly indicated the subject matter of the question — the rezoning of certain properties along Route 3. The question was stated as follows:

"To rezone certain parcels of land in the median strip, the west side of the southbound lane and the east side of the northbound lane of Route 3; and to rezone one parcel of land on the west side of Brockbridge Road near Ellen Street; all parcels of which are in the Fourth Assessment District and

which were rezoned by virtue of amendments to Bill No. 59-73."

The problems the majority finds with the ballot title are basically two: the failure of the ballot title to give the precise location of the properties to be rezoned and the failure to specify the nature of the rezoning as to each.

First, as to the failure of the ballot title to give the precise location of the properties in question, it seems clear that the wording of the question was both accurate and the best statement of location possible under the circumstances. As the majority itself observes at note 2, in criticizing the referendum petition which gave the complete location of each of the properties together with its present and proposed zoning, the text of the petition was necessarily such that it could be read only with "the assistance of a magnifying glass." Surely the majority cannot then contend that the ballot was deficient in failing to likewise include metes and bounds descriptions and details of zoning.

Secondly, and perhaps most ardently, the majority urges that the ballot title was inadequate in failing to specify whether the "rezoning" was "up-zoning" or "down-zoning." While it is true that in this respect the ballot title could have been more specific, this level of generality is insufficient grounds for voiding the election. It has been observed that "[s]o long as the attention of the electorate is reasonably drawn to the issue involved, claims of generalities will not be honored." C. Antieau, Municipal Corporation Law § 17.14 at 558 (1974); see Concrete, Inc. v. Rheaume Builders, 101 N. H. 59, 132 A. 2d 133, 135 (1957); McDonald v. Van Winkle, 136 Ore. 706, 299 P. 1015, 1017 (1931); Martin v. Hart, 296 Ill. 149, 129 N. E. 693, 695 (1920). To state that the purpose of the amendments was to rezone the parcels in question was, as the majority apparently concedes, accurate. The comprehensive zoning ordinance gave these parcels residential zoning; the amendments petitioned to referendum had the effect of rezoning the properties by placing them in various commercial and industrial categories. Furthermore, specific reference is made to the ordinance in question, Bill No. 59-73.

It is too much to ask, as the majority seems to do, that a ballot title alone present enough information that a voter, confronted for the first time with the question in the voting booth, be able to render a truly informed decision. Yet the majority, citing an Ohio case, *Markus v. Trumbull County Board of Elections*, 22 Ohio St. 2d 197, 259 N.E.2d 501, 504 (1970), holds that the descriptive title of a question appearing on the ballot must be in such form " 'that the voter may have at hand some means for making up his mind whether to approve or disapprove the issue.' " It is not possible, nor is it necessarily desirable, that all aspects and nuances of a question be discussed in the ballot title. While the question of sufficiency of the summary of the contents and purpose of referred legislation on the ballot is necessarily a matter of degree, it is nonetheless certain that considerable reliance must be placed on outside sources of publicity to fill in the details.

Here there was evidence on the record of extensive publicity given the issue of the Route 3 rezoning. In fact, the extent of the pre-election publicity surrounding Question No. D was a sufficient supplement to the language of the ballot title to assure that the election would be a full and fair expression of the will of the voters. *See Dutton v. Tawes, supra,* 225 Md. at 493. Three fully noticed public hearings were held on the measure by the Planning and Zoning Commission and eight by the County Council after submission of the comprehensive plan. It is not necessary to detail the very extensive extra-governmental publicity given to the question, including numerous newspaper articles, some of which contained the full text of the amendments, and the sample ballots distributed by the League of Women Voters. Suffice it to say that an officer of the Planning and Zoning Commission of Anne Arundel County testified that the Route 3 rezoning received by far the greatest publicity of any activity of the County Council.

The majority dismisses the effect of the pre-election publicity given this question by citing the fact that this action was commenced before the election. The principle referred to is that stated in *Dutton v. Tawes, supra,* 225 Md.

at 495, to the effect "that when an election has been held and it is not shown that the failure of election officials to hew strictly to the statutory line has prevented a full and fair expression of the will of the voters the Courts will not disturb the result." In a dictum relied on by the majority here, the Court in *Tyler v. Secretary of State*, 230 Md. 18, 22, 185 A. 2d 385 (1962), indicated that when an action is filed prior to the election, the court may permit the election to take place, and then later try the issues in the posture of a pre-election challenge.

First, the majority misconstrues the use which appellants make of the pre-election publicity. The principle stated in *Dutton*, that an election will not be declared invalid where, because of the surrounding circumstances, the result was an intelligent expression of the popular will, is directly applicable only where there has first been found a deviation from statutory election standards. Here the question is not what the effect of a deviation shall be, but rather the question is whether the ballot title in fact deviated from the requirements of § 16-6 (a). The argument proffered by appellants is simply that in assessing the sufficiency of the ballot title under § 16-6 (a), the wording of the question must be viewed in light of the surrounding circumstances. As discussed above, reliance must necessarily be placed in an election on the surrounding publicity to fully apprise the voters of the nature and purpose of a question.

Moreover, I have serious reservations about the efficacy of the procedure indicated in *Tyler*. While it may well be that the distinction drawn in *Dutton* between the effect of election irregularities challenged before and those challenged after an election is a legitimate one, to stay a challenge until after the election is held and then treat the action as a pre-election challenge is inconsistent with that distinction. The rationale for the rule of *Dutton* is that "it would be unjustifiable to defeat the expressed will of the electorate if the irregularity did not frustrate or tend to prevent a free expression of the electors' intention . . . ." *Lexington Park v. Robidoux*, 218 Md. 195, 200, 146 A. 2d 184 (1958); *Carr v. Hyattsville*, 115 Md. 545, 549, 81 A. 8 (1911). It

is equally unjustifiable, when a challenge is presented before an election, to permit the election to take place, and then invalidate the election because of an irregularity that did not affect the result. In either case the result is the frustration of the expression of the popular will.

There can be little doubt that here the disapproval of the amendments referred to the voters of Anne Arundel County represented the full and fair expression of the will of the electorate. The measure was defeated by a vote of 36,656 to 11,314, approximately a three-to-one margin. Furthermore, the public record of the results of the November 1974 election shows that more people voted on Question No. D in Anne Arundel County than voted for the candidates for Governor of the State. This Court should be most reluctant to assume that the voters of Anne Arundel County, especially in view of the publicity surrounding the vote on Question No. D, did not know what they were voting for or against. *Morris v. Governor, supra*, 263 Md. at 27. I would hold, therefore, that the election is not void for failure of the ballot title to comply with § 16-6 (a) of Article 33.

Chief Judge Murphy authorizes me to state that he concurs in the views expressed herein.