578 A.2d 745

**Blondine SURRATT, et al.**

v.

**PRINCE GEORGE'S COUNTY, MD.**

No. 140, Sept. Term, 1989.

Court of Appeals of Maryland.

Sept. 4, 1990.

**440**

Elizabeth H. Hamlin (Christmas, Hamlin and Blaszkow, P.C., on brief), Washington, D.C., for petitioners.

Michael O. Connaughton, Upper Marlboro, and Michael P. DeGeorge (Mell & Associates, Washington, D.C.) on brief, for respondent.

Argued before ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS * and CHASANOW and CHARLES E. ORTH, Jr., Judge of the Court of Appeals of Maryland, (retired, Specially Assigned), JJ.

---

* Adkins, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Art. IV, § 3A, he also participated in the decision and the adoption of this opinion.

ADKINS, Judge.

In *Prince George's County v. Fitzhugh,* 308 Md. 384, 519 A.2d 1285 (1987), we held that § 1013 of the Prince George's County Charter constituted a full waiver of governmental immunity because a purported limitation of the scope of the immunity embodied in a 1982 charter amendment was not authorized by the Express Powers Act. We now hold that 1986 amendments to § 1013 were equally ineffective to abolish the waiver of immunity. We further hold that a plaintiff who accepts a remittitur may, nevertheless, cross-appeal if the defendant appeals. As a consequence of that holding, we deal with a difficult issue involving recusal of the trial judge. We reverse the judgment of the Court of Special Appeals in *Prince George's County v. Surratt,* 80 Md.App. 415, 564 A.2d 95 (1989).[1]

## I. WAIVER OF IMMUNITY

To place this issue in context, we need sketch only briefly the outlines of the underlying litigation. We shall supply additional details when we address the other issues.

### A.

Petitioners Blondine Surratt and Donald Jackson were the parents of Baby Boy Surratt who died at the age of 14 days as a result, petitioners alleged, of obstetrical malpractice. After their claims had been rejected by a health claims arbitration panel, Surratt (as personal representative of the infant's estate and as his mother) and Jackson (as the

---

1. Respondent Prince George's County has moved to dismiss this case "insofar as it relates to the remittiturs [and the trial judge's] refusal to recuse himself." The motion is based on a quotation from the first page of the Petition for Writ of Certiorari, at which point petitioners mention only the immunity issue. The motion asserts that the issues mentioned in it are not properly before us. The motion is frivolous. At pages 7–9 of the petition, under the heading "QUESTIONS PRESENTED," petitioners list in exquisite detail all the issues we have ·mentioned, and more. We granted that petition in full. The motion is denied.

child's father) sued a doctor and respondent Prince George's County (owner and operator of the hospital where Surratt had undergone prenatal treatment and where the baby had been born). A jury awarded damages of $533,739.86 against the County, the trial court having rejected the County's plea of governmental immunity. The Court of Special Appeals decided otherwise and held that "the claims of medical malpractice and wrongful death are barred by governmental immunity." *Surratt*, 80 Md.App. at 418, 564 A.2d at 97. Our review of that holding requires us to revisit the somewhat convoluted history of governmental immunity in Prince George's County.

### B.

*Fitzhugh* traces that history, 308 Md. at 387–389, 519 A.2d at 1286–1287. Section 1013 of Prince George's County's first charter, adopted in 1970, in pertinent part permitted "[t]he County [to be] sued in actions sounding in tort in the same manner and to the same extent that any private person may be sued." *Id.* at 387, 519 A.2d at 1286. In *Bradshaw v. Prince George's County*, 284 Md. 294, 396 A.2d 255 (1979), we held that that language meant what it said, but no more than that. We concluded that the waiver did not extend to public official immunity of individual police officers, and that if the officers were immune, the County could not be held liable on the basis of *respondeat superior.* 284 Md. at 303–305, 396 A.2d at 261–262.

Although § 1013 had been somewhat amended in 1976, *James v. Prince George's County*, 288 Md. 315, 320–321, 418 A.2d 1173, 1176–1177 (1980), pronounced that the section still waived fully the County's governmental immunity. We modified *Bradshaw*, however, by holding that the language of the section "makes the county liable for the negligent conduct of all of its employees occurring in the course of their employment, without regard to their status as public officials." 288 Md. at 336, 418 A.2d at 1184 [footnote omitted]. *See also Cox v. Prince George's County*, 296 Md. 162, 460 A.2d 1038 (1983).

It seems that the County was not pleased with the outcome of *James*. The county attorney's office drafted an amendment to § 1013 which was adopted in 1982. The section then read [language added in 1982 emphasized]:

> The County may be sued in actions sounding in tort *for which its officers, agents, and employees may be liable,* by actions filed in the courts of the State of Maryland, or in the United States District Court for the District of Maryland, with a maximum liability of ... ($250,000) per individual, per occurrence, to the extent of its liability insurance, whichever may be greater. The County shall carry liability insurance to protect itself, its officers, agents, and employees. Nothing herein shall preclude the County from meeting the requirements of this section by a funded self-insurance program, and nothing herein shall be deemed to be a waiver of any charitable, governmental, or sovereign immunity which any officer, agent, or employee shall otherwise have, by reason of any Statute of the United States of America, public general law of the State of Maryland, or common law as determined by the Courts of Maryland.

*Fitzhugh*, 308 Md. at 389, 519 A.2d at 1287.

That version was before us in *Fitzhugh*, where we struck down, as unauthorized by the Express Powers Act,[2] the attempt to limit "the county's waiver of governmental immunity to cases in which county officers, agents, or employees do not possess public official or any other sort of individual immunity." *Id.* at 389, 394, 519 A.2d at 1287, 1290. We declined to decide whether the emphasized language (that added in 1982) could be severed, because the result would be the same in either case:

> If the offending provision is severed, the remainder of § 1013 constitutes a full waiver of governmental immunity. The section would read as it did in 1976, and in *James* we held it had that effect. If the language added in 1982 is not severed, § 1013 is invalid in its entirety, because of

---

**2.** Code (1957, 1987 Repl.Vol., 1989 Cum.Supp.), Article 25A, §§ 4–6.

its violation of the Express Powers Act. The total invalidity of the 1982 version of § 1013 means that this case is governed by the section as it was adopted in 1976.

*Id.* at 395, 519 A.2d at 1290.

It seems that the outcome of *Fitzhugh* was not to the County's liking either, and that it had foreseen the possibility of that outcome even before our decision. In 1986 the county attorney's office drafted and the voters adopted yet another version of § 1013. *Fitzhugh,* 308 Md. at 388–389 n. 3, 519 A.2d at 1287 n. 3. The pertinent portions of that draft provided [new language emphasized]:

The County may be sued in actions sounding in tort *only for those occurrences* for which its officers, agents, and employees may be liable.... *The sentences, clauses or phrases of this section shall not be severable. If any such sentence, clause or phrase of this section is declared unconstitutional or invalid for any reason, then it is intended and declared by the people of the County that the entire section be declared invalid.*

It is the non-severability portion of this amendment that the County invokes in this case. Since *Fitzhugh* in effect held invalid the attempt to limit immunity evidenced by the first sentence, the County argues that the second sentence effectively repeals § 1013 altogether, thereby abolishing any waiver of governmental immunity. It persuaded the Court of Special Appeals to adopt this position, and thus to reverse the earlier judgments in favor of Surratt and Jackson. *Surratt,* 80 Md.App. at 423, 564 A.2d at 99. Were the 1986 amendment to the charter valid, that holding might well be correct. But the amendment was not valid. We explain.

## C.

In *Anne Arundel Co. v. McDonough,* 277 Md. 271, 354 A.2d 788 (1976), we struck down the results of a referendum because we were

convinced that the failure of the ballot question to present a clear, unambiguous and understandable statement of the full and complete nature of the issues included in [that question], coupled with the advertisements, limited as they were to a verbatim statement of the Question[,] constituted a "deviation from the prescribed forms of the law [and] had so vital an influence as probably to have prevented a free and full expression of the popular will."

*Id.* at 307, 354 A.2d at 809 (quoting *Dutton v. Tawes,* 225 Md. 484, 491, 171 A.2d 688, 691 (1961)). We explained that "Question D," both as it was stated on the voting machines, and as it was advertised prior to the election, was so inaccurate, ambiguous and obtuse, that an ordinary voter, of average intelligence, could not, in a meaningful and comprehending manner, have knowledgeably exercised his franchise when called upon to vote either "FOR" or "AGAINST" that question.

*McDonough,* 277 Md. at 307–308, 354 A.2d at 809.

The ballot question in *McDonough* concerned a referendum on a complex zoning question. The ballot read:

"QUESTION NO. *D*

REFERENDUM

To rezone certain parcels of land in the median strip, the west side of the southbound lane and the east side of the northbound lane of Route 3; and to rezone one parcel of land on the west side of Brockbridge Road near Ellen Street; all parcels of which are in the Fourth Assessment District and which were rezoned by virtue of amendments to Bill No. 59–73."

277 Md. at 278, 354 A.2d at 792–793. Voters were directed to vote "FOR" or "AGAINST" this question. *Id.*

We thought that the question, so worded, limited the choice of voters "to a vote 'FOR' or 'AGAINST' *'rezoning.'* " *Id.* at 298, 354 A.2d at 804. [emphasis in original].

As so limited, the ballot failed to disclose the nature of the rezoning (which involved 41 different amendments to County Bill No. 59–73), the location of the properties, or that the zoning of the J.F. Johnson Lumber Co., which was the subject of one of the amendments, would not, in fact, be affected in any way by the referendum. *Id.* at 298–299, 354 A.2d at 804. As a consequence, the ballot question did not comply with the requirement of Maryland Code (1957, 1986 Repl.Vol.), Article 33, § 16–6(a), that a ballot " 'shall contain a condensed statement in understandable language of every ... question to be submitted to the vote of the people.' " 277 Md. at 287, 354 A.2d at 798. Rather, Question D failed to "present a clear, unambiguous and understandable statement of *the full and complete nature* of the issues undertaken to be included in the proposition." 277 Md. at 300, 354 A.2d at 805. [Emphasis supplied; footnote omitted.]

In the case before us, the question presented on the ballot was not by way of "a brief summary of the contents or purpose" of the proposed charter amendment (the § 16–6(a) procedure used in *McDonough* ). Instead, it was through printing the title of the amendatory bill adopted by the Prince George's County Council (an alternative procedure permitted by § 16–6(a)). *See Lexington Park v. Robidoux,* 218 Md. 195, 199–200, 146 A.2d 184, 186 (1958) (construing Code (1957), Art. 33, § 94(i), a predecessor to § 16–6(a)). Whichever alternative is used, however, the first sentence of § 16–6(a) still directs that the ballot's wording must constitute a "statement in understandable language" of the question to be submitted to the voters. As *McDonough* makes clear, "understandable language" includes the concept that the ballot wording must convey with reasonable clarity the actual scope and effect of the measure, if adopted. The language used here did not meet that requirement.

The ballot presented to the voters of Prince George's County in 1986 said this:

PROPOSED CHARTER AMENDMENT

To provide that in all pending and future claims the County will only waive its immunity in those instances where its officers and employees are liable.

What this tells the reader is that the charter in essence will remain unchanged, for that is what the charter already provided as a result of the 1982 amendments: "The County may be sued in actions sounding in tort for which its officers, agents, and employees may be liable." The 1986 addition of "only for those occurrences," inserted after "actions sounding in tort," added nothing substantive to and changed nothing substantive in the meaning of this sentence.

The real change proposed by the 1986 amendment, of course, was its nonseverability provision. As we have seen, this was intended to effect a total repeal of the waiver of governmental immunity should the first sentence be struck down. The ballot contained not the slightest hint of that possible outcome. A voter who read the ballot language would have no inkling that a vote in favor of the charter amendment could be a vote in favor of repealing absolutely the waiver of governmental immunity that had existed in Prince George's County, in one form or another, since the original charter of 1970. Like the "inaccurate, ambiguous and obtuse" language before us in *McDonough*, 277 Md. at 307–308, 354 A.2d at 809, the verbiage here did not and could not convey to a voter an understanding of "the full and complete nature" of what the charter amendment involved. *Id.* at 300, 354 A.2d at 805. In point of fact, it told the voter *nothing* about what really was involved.

> Where a legislative title is used as the ballot question, the prescriptions of Article III, § 29 of the Constitution, concerning the sufficiency of the title, come into play and the title-ballot question must embrace one subject, fairly apprise the voters of the purpose of the act, not be misleading and not [be] calculated to lead the public to believe that the proposed legislation is substantially dif-

ferent from that which would actually become law under the statute.

*Id.* at 295–296, 354 A.2d at 802.[3]  Putting aside the question of "single subject," the ballot title used here fails the test in every respect.  It *was* misleading, and it *was* calculated to suggest to the voter that the charter amendment would have virtually no effect—and certainly not the repeal of the waiver of immunity.  *See, e.g., Shipley v. State,* 201 Md. 96, 100–104, 93 A.2d 67, 69–71 (1952) (title to bill referred only to Art. 66½; portions of bill purporting to amend Art. 89B, unconstitutional under Art. III, § 29); *Culp v. Comrs. of Chestertown,* 154 Md. 620, 141 A. 410 (1928) (title to act authorized issuance of bonds, but failed to disclose creation of special commission that was to have equal authority with town commissioners to expend proceeds; act unconstitutional).

The County protests that it performed all the legal prerequisites with respect to acquainting the voters with the proposed charter amendment.  Under those circumstances, it assures us, *Dutton v. Tawes, supra,* instructs that "there is a clearly recognized difference between the effect given to modal provisions of the election laws before the election and the effect of the same provisions after election."  225 Md. at 491, 171 A.2d at 690.  This is because

> if the election has been held before court action is sought [obviously, this is the case here] and it is not shown that the failure of the officials to follow the law has interfered with the full and fair expression of the will of the voters, that expressed choice will not be disturbed by the Courts.

*Id.,* 171 A.2d at 690–691.

The "modal provisions" required in connection with the adoption of charter amendments appear to be the provisions of § 317 of the county charter requiring notice of and a public hearing on any legislation introduced, including posting of a copy of the bill in a "public place," and § 320's

---

**3.**  Section 317 of the Prince George's County Charter contains a provision similar to Article III, § 29.

directive that "all laws and all amendments to this Charter ... be published promptly following their enactment." Additionally, § 1105 commands that any proposed charter amendment "shall be published by the County Executive in the [three] County newspapers of record for five successive weeks prior to the election at which the question shall be considered by the voters of the County." Nothing in the record shows that the County followed any of these provisions. Nevertheless, we shall assume that all of them were complied with. It makes no difference. We are not dealing here with failure to publish notices precisely as required by statute, as was the case in *Dutton*.

In that case, the statute required publication in 56 newspapers; the act in question was reproduced only in one. 225 Md. at 493, 171 A.2d at 691. Yet "[t]here were published [throughout the State] some one hundred twenty-two articles, in many of which [were] the views pro and con of public officials and prominent citizens as to various aspects of the [Potomac River] compact" as well as numerous letters to the editor and radio and television news broadcasts. *Id.*, 171 A.2d at 692. The Court thought that this achieved substantial compliance with the purpose of the notice provisions—to acquaint the public with the law involved—and refused to strike it down.

But here, even if we assume publication of the full text of the proposed charter amendment in three newspapers for five weeks prior to the election, another crucial element of the notice procedure—the ballot language itself—was totally defective. And while the assumed publication of the statutory text serves to distinguish one aspect of this case from *McDonough*, there is no hint here that the 1986 amendments to § 1013 were the subject of anything like the public debate described in *Dutton*.

In any case, we have here something more than a mere lack of notice or non-compliance with some other "modal provision[ ] of the election laws." We have a misleading and inaccurate notice given at the point and moment of greatest impact: on the ballot confronted by the citizen in

the voting booth. *McDonough* constrains us to hold that the 1986 amendments to § 1013 of the Prince George's County charter were invalidly adopted. The charter provision that is before us is the same one we considered in *Fitzhugh.* And pursuant to the holding in that case, the version of § 1013 that pertains here is the one adopted in 1976. 308 Md. at 395, 519 A.2d at 1290.

### D.

The 1976 version of § 1013, as earlier quoted, permits Prince George's County to be sued in tort, but subject to "a maximum liability of . . . ($250,000) per individual, per occurrence, to the extent of its insurance coverage, whichever may be greater." The section goes on to direct that "[t]he County shall carry liability insurance to protect itself, its officers, agents and employees," but nevertheless provides that "[n]othing herein shall preclude the County from meeting the requirements of this section by a funded self-insurance program. . . ."

In this case, the jury's verdicts against the County in the aggregate sum of $533,739.86, were computed thus:

| | |
|---|---|
| For Blondine Surratt, individually | $350,000 |
| For Donald Jackson | $150,000 |
| For Blondine Surratt, personal representative of Baby Boy Surratt | $ 33,739.86. |

As the last stage of its sovereign immunity argument, the County claims that § 1013 limits its liability to a total of $250,000.[4] The County fares better on this contention than it has heretofore.

---

**4.** As we shall discuss later in more detail, the trial court granted a remittitur by which he reduced the judgment in favor of Surratt individually to $200,000 and that in favor of Jackson to $50,000. He seems to have done so on the basis that his conscience was shocked by the judgments, and not on any theory that the County's immunity was limited to $250,000. He left undisturbed the judgment in favor of Surratt as personal representative. Under the County's "one occur-

■ The $250,000 per individual, per occurrence language of § 1013 is derived from former § 5(CC) of Article 25A (The Express Powers Act),[5] which was in effect when the 1976 version of § 1013 was adopted. The pertinent provisions of § 5(CC) read:

> Any chartered county enacting legislation or otherwise waiving sovereign immunity under this subsection shall carry comprehensive liability insurance to protect itself, its agents and its employees. The purchase of this insurance shall be considered as for a public purpose and as a valid public expense. The liability of any county under this subsection may not be greater than $250,000 or the amount of its insurance coverage, whichever is greater, per individual per occurrence.

The charter language, despite its garbling of the third sentence, quoted above, is clearly intended to track this language. And the § 5(CC) wording, we think, manifests a legislative purpose to look to commercial liability insurance policies for the meaning of the somewhat cryptic "per individual per occurrence." That is manifested by the several references to "comprehensive liability insurance" and "this insurance." It is also manifest that some limitation of liability is intended by this language.

It is not uncommon for a commercial liability policy to establish one limit of liability for each individual's claim and another larger one, for the entire "occurrence." *Daley v. United Services*, 312 Md. 550, 553, 541 A.2d 632, 633 (1988). That, indeed, is the approach of the Local Government Tort Claims Act. *See* Md.Code (1989 Repl.Vol.), § 5–403(a) of the Cts. & Jud. Proc. Art. ("[t]he liability of a local govern-

---

rence" theory the aggregate judgments entered after remittitur would exceed the $250,000 maximum said to be established by § 1013.

5. Section 5(CC) was repealed by Chapter 594 of the Acts of 1987, which enacted the local Government Tort Claims Act (subtitle 4 of title 5, Code (1989 Repl.Vol.) Courts and Judicial Proceedings Article). Chapter 594 took effect 1 July 1987, but its provisions apply "only to actions arising from events occurring on or after" its effective date. Ch. 594, §§ 5 and 3.

ment may not exceed $200,000 per an individual claim, and $500,000 per total claims that arise from the same occurrence ...."), and n. 5, *supra.* The verbiage of §§ 1013 and 5(CC) is a bit more cloudy, but under the facts of this case, we conclude that it supports the County's position.

In *Daley*, we had before us an insurance policy that imposed, for bodily injury liability, a limit of $100,000 for "each person" and what we described as "a $200,000 'each occurrence' limit for all such damages arising out of bodily injuries sustained by two or more persons as a result of any one occurrence." 312 Md. at 552, 541 A.2d at 633. The claimants in that case were the parents of a minor child who had been killed as the result of the negligence of the insured. The parents, like Surratt and Jackson, brought wrongful death and survival actions, recovering a total of $225,000. We held that the only bodily injury was to the child and that the parents' (and the estate's) claims were derivative from that injury. "Therefore, such consequential or derivative damages are computed together with the claim for bodily injury of which they are a consequence." *Id.* at 554, 541 A.2d at 634. Judge Cole, writing for the Court, observed that "[t]hese principles have been applied in wrongful death actions." *Id. See also Smith v. Gross*, 319 Md. 138, 143 n. 4, 571 A.2d 1219, 1221 n. 4 (1990) ("injured party" under wrongful death statute is the "decedent"). *And see* F. Harper, F. James & O. Gray, *The Law of Torts*, § 23.8, at 449 (2d ed. 1986) (survival action is "derivative in the fullest sense of the term").

Judge Cole went on, in *Daley*, to explain that "[w]here state law creates a right to damages for mental anguish suffered by those in specified relationships to the person who suffers bodily injury or death, it has been held that the damages for mental injury are, in effect, derivative of the single bodily injury." 312 Md. at 554, 541 A.2d at 634. He also compared the parents' claim for solatium damages to a claim for loss of consortium, citing cases holding such a claim to be derivative. *Id.* at 556, 541 A.2d at 634–635.

Therefore, whether we view the death of Baby Boy Surratt as the occurrence, or whether we view him as the one person who was injured within the contemplation of § 1013, the $250,000 limit applies. *See also Chicago Insurance Co. v. Pacific Indem. Co.*, 566 F.Supp. 954 (E.D.Pa. 1982), *aff'd*, 720 F.2d 660 (3d Cir.1983).

■ Surratt and Jackson attempt to avoid this conclusion by persuading us that the 1976 version of § 1013 is invalid, and urging that we revert to the original waiver provision, which contained no limitation of liability. We are not convinced.

The argument here is that the 1976 version of § 1013, in addition to tracking Article 25A, § 5(CC) with respect to limits of liability and the mandatory purchase of liability insurance, added that "[n]othing herein shall preclude the County from meeting the requirements of this section by a funded self-insurance program...." Since § 5(CC) did not authorize self-insurance, the argument continues, that portion of § 1013 is invalid under *Fitzhugh*. And, say Surratt and Jackson, the language is not severable, so the 1976 § 1013 falls, and we return to 1970.

They read *Fitzhugh* too strictly. It is true that we there held that a county that waived immunity pursuant to § 5(CC) had to do so within the confines of that subsection's authorization. 308 Md. at 393–394, 519 A.2d at 1289–1290. Since § 5(CC) permitted only a waiver that would allow suit in " 'the same manner and to the same extent that any private person may be sued' " no lesser waiver would suffice. *Id.* It is true, also, that § 5(CC) was concerned with insurance. Chapter 825 of the Acts of 1976 (by which § 5(CC) was enacted) explains that the legislation was

FOR the purpose of permitting chartered counties to waive the defense of sovereign immunity in certain cases; and *requiring any county waiving this defense to establish an insurance program.* [Emphasis supplied]

But the emphasis on insurance and the specific textual reference to "comprehensive liability insurance" do not rule out the possibility of self-insurance.

The General Assembly's paramount goal was to assure the authority of counties to waive governmental immunity—an authority that was questionable in 1976, because *Bradshaw*, holding that this authority was granted by Article 25A, § 5(S) (general welfare), had not yet been decided. *See* 284 Md. at 299, 396 A.2d at 258–259. As a means of effectuating that goal, the legislature called for limits on liability should immunity be waived. Those limits, however, were flexible, for a county could go above the statutory $250,000 by purchasing insurance with a higher limit. This evidences the legislature's interest in local fiscal stability: a liability limit of $250,000 only if the county did not protect itself by purchasing insurance. Were that protection procured, the limit could be increased.

To be sure, the legislation shows a concern with the purchase of insurance; but that concern, manifested by the direction to purchase, also could be met by or funded through self-insurance—a method not unfamiliar to the General Assembly in 1975. For example, by Chapter 403, Acts of 1973, the legislature enacted former Code (1957, 1969 Repl.Vol., 1973 Cum.Supp.), Article 95, §§ 25–35, dealing with both self-insurance and purchased insurance to cover certain potential State liability. Those sections were adopted under the subtitle "State Insurance Program"—the identical language used in the title of the bill adopting § 5(CC). Clearly, an "insurance program" may encompass both methods of protection. In fact, the Fiscal Note on HB 1813 of 1976 (the bill that enacted § 5(CC)) stated that an "alternative [to procuring insurance from an insurance company] would be for the County to become a self-insurer and appropriate funds to a special contingency fund to be used for such insurance coverage." We believe that § 1013's self-insurance provision is in harmony with the legislative purpose of § 5(CC).

■ Therefore, subject to one caveat we shall shortly note, the $250,000 limitation applies here. The total judgment must be reduced to that amount, unless the County has purchased insurance with a higher limit.

The County represents that it has not—that it is self-insured. Surratt and Jackson, however, point to some post-judgment documents produced by the County, and introduced into evidence at the remittitur hearing. At that time, the trial judge announced he was "not interested" in those documents, perhaps because he was about to grant the remittitur. Nevertheless, one of the papers, entitled "Schedule of Insurance in Force, June 30, 1984" discloses that for the policy period "7/29/83—7/29/84," the County had in force St. Paul Fire and Marine Medical Professional Liability Policy No. 519JC8758, with liability limits of $500,-000 per person and $1,000,000 aggregate.

That policy period post-dates the conduct that caused the death of Baby Boy Surratt in the winter of 1983. But we know nothing about the coverage provisions of the policy, or whether there was an earlier one in effect. Surratt and Jackson subpoenaed County insurance records back to 1976, but the County failed to produce any from earlier than 1984. It now becomes necessary to examine the subject of insurance more closely.

The issue of insurance coverage, if any, did not become important until judgments were entered on the jury verdicts. At that point, the question of limitation of liability was presented: $250,000 or any greater limit contained in a County liability insurance policy. Since the County was contending for a limitation of liability, it was incumbent upon it to prove what the applicable limit was. The existence or non-existence of insurance was particularly within the County's knowledge. *Maryland State Department of Health and Mental Hygiene v. Phoebus*, 319 Md. 710, 718, 575 A.2d 335, 339 (1990). The trial judge, seemingly preoccupied with the County's remittitur motion (based mainly on the argument that the awarded damages were "excessive and shocking to the Court's conscience"), brushed aside the

problem of § 1013 limits on liability, whether that limit might be $250,000 or a higher amount established by an insurance policy.

This case, therefore, must be remanded to the circuit court for determination of whether the County had liability insurance coverage applicable to the claims here involved, and if so, what were the liability limits of any such policy. If there was such a policy, and its limits of liability exceeded $250,000, the policy limits will control the maximum amount of a permissible judgment against the County. If there is no such policy, the $250,000 § 1013 maximum governs. In that event, on remand there must be a determination of how the $250,000 is to be apportioned among the petitioners. But, since that figure is less than the judgment entered pursuant to the remittitur, there ordinarily would be no need to consider Surratt's and Jackson's contentions relating to the remittitur—whether they could appeal and whether the trial judge should have recused himself. If, however, there is an insurance policy with limits equal to or in excess of the judgment entered by the trial judge, those matters become important, because the validity of the remittitur becomes important. In the interests of judicial economy, and for the guidance of the trial court, we address those issues.[6]

## II. REMITTITUR AND APPEAL

■ After judgments were entered on the jury's verdicts the County moved for judgment n.o.v., for a new trial or, in the alternative, for a remittitur. The trial judge denied the j.n.o.v. motion but, as we have seen, ordered a remittitur reducing Surratt's judgment from $350,000 to $200,000 and Jackson's from $150,000 to $50,000. In the event the plain-

---

**6.** The $350,000 "cap" on noneconomic damages set forth in § 11–108 of the Courts & Judicial Proceedings Article does not affect this case; it applies only to a "jury trial commencing after [July 1, 1989]." Ch. 629 of the Acts of 1989, § 2.

tiffs did not accept the remittitur, the judge ordered a new trial on damages only.

Surratt and Jackson then filed a motion requesting that the remittitur order be vacated and that the judge recuse himself. When that relief was denied, the plaintiffs accepted the remittitur.

Thereafter, the judge assessed the costs of the health claims arbitration proceedings and of certain depositions against the plaintiffs. The County appealed. Surratt and Jackson filed a timely cross-appeal. Among the questions raised in the cross-appeal (and in the petition for certiorari) is the issue of whether the trial judge should have recused himself. But we cannot reach that issue if the cross-appeal was impermissible.

The County argues that Maryland appellate courts have consistently held that "a Plaintiff's acquiescence in an Order for remittitur and acceptance of the lesser amount is a bar to appellate review." It cites *Kneas v. Hecht Company*, 257 Md. 121, 123–124, 262 A.2d 518, 520 (1970); *State, Use of Shipley v. Walker*, 230 Md. 133, 137–138, 186 A.2d 472, 474 (1962); *Turner v. Wash. Sanitary Comm.*, 221 Md. 494, 505, 158 A.2d 125, 131 (1960); and *Podolski v. Sibley*, 12 Md.App. 642, 647, 280 A.2d 294, 297 (1971). What the County asserts is, in a sense, correct. The cases cited contain holdings to that effect, except for *Podolski*, in which the language is only dictum. This seems to be the common law, and probably the majority rule, at least where unchanged by statute or rule of court. *See* Annotation, *Party's Acceptance of Remittitur in Lower Court as Affecting His Right to Complain in Appellate Court as to Amount of Damages for Personal Injury*, 16 A.L.R. 3d 1327 (1967 & 1989 Supp.).

We have explained the principle upon which the general rule in Maryland is based: "a voluntary act of a party which is inconsistent with the assignment of errors on appeal normally precludes that party from obtaining appellate review." *Franzen v. Dubinok*, 290 Md. 65, 69, 427

A.2d 1002, 1004 (1981). In analyzing that explanation, we focus on the adverb "normally" for it suggests that under some circumstances the general rule may not apply. The "normal" situations in which the rule precluding appeal has been invoked are those that involve an appeal by the plaintiff with none by the defendant. That was the procedural posture in *Kneas, Walker,* and *Turner,* all *supra. See also Donovan v. Penn Shipping Co.,* 429 U.S. 648, 97 S.Ct. 835, 51 L.Ed.2d 112 (1977) (applying to federal courts the rule precluding appeal). But that is not the procedural posture of the case before us, for here the defendant (the County) appealed. Only after that had occurred did the plaintiffs (Surratt and Jackson) cross-appeal. Thus the issue here, as noted by the Court of Special Appeals, *Surratt,* 80 Md.App. at 417 n. 2, 564 A.2d at 97 n. 2, is one of first impression in Maryland.

To be sure, there are cases that hold that this distinction should make no difference. Some, like *Hudson v. Otero,* 80 N.M. 668, 672, 459 P.2d 830, 834 (1969), expressly reject the notion that a defendant's appeal followed by a plaintiff's cross-appeal justifies a variation in the general rule. Others, like *Iseman v. Kansas Gas & Electric Co.,* 222 Kan. 644, 652, 567 P.2d 856, 862 (1977), and *Fulton v. Ewing,* 336 Mich. 51, 58, 57 N.W.2d 441, 444 (1953), either rely on precedent, with little analysis, or cite no authority for the proposition. A not insubstantial body of cases, however, reaches a contrary result when faced with circumstances like those now before us.

The leading case is *Plesko v. Milwaukee,* 19 Wis.2d 210, 120 N.W.2d 130 (1963). There a remittitur was ordered, the plaintiff accepted it, the defendant appealed, the plaintiff cross-appealed. The Supreme Court of Wisconsin observed that the purpose of the remittitur procedure was to allow the plaintiff to choose between a reduced judgment on the one hand and the disadvantages involved in a new trial or an appeal on the other. 19 Wis.2d at 221, 120 N.W.2d at 135. "In most situations," reasoned the court,

it is likely that the [plaintiff] will accept judgment for such reduced damages rather than undergo the expense, delay, and uncertainty of result of an appeal or new trial. Nevertheless, if a party found liable to pay damages appeals the judgment resulting from the party's accepting such reduced damages, this objective has been negatived. When plaintiff is forced to undergo an appeal by the action of an opposing party, after plaintiff has accepted judgment for such reduced damages, it seems unfair to prevent his having a review of the trial court's determination leading to the reduction in damages.

*Id.*

In the course of reaching a similar result, a New Jersey court asked: "Why should defendant get the benefit of the reduced verdict and be able to appeal on all issues without risking a restoration of the jury's verdict?" *Mulkerin v. Somerset Tire Service, Inc.,* 110 N.J. Super. 173, 177, 264 A.2d 748, 750 (1970). Its response: "No sound reason for such benefits to defendant exist." *Id.* The District of Columbia Court of Appeals put it succinctly:

We agree that the rationale supporting the traditional common law rule is absent when the plaintiff is forced into the position of responding to an appeal brought by the defendant. We conclude that where the party who benefits from a remittitur appeals the judgment on other grounds the party who accepts a remittitur may contest the remittitur on cross-appeal.

*Doe v. Binker,* 492 A.2d 857, 862–863 (D.C.App.1985).

Other jurisdictions have followed this reasoning. *See Morrison v. Lowe,* 274 Ark. 358, 363, 625 S.W.2d 452, 455 (1981); *Miller v. National American Life Ins. Co.,* 54 Cal.App.3d 331, 343–345, 126 Cal.Rptr. 731, 737–739 (1976); *Burns v. McGraw–Hill Broadcasting Co., Inc.,* 659 P.2d 1351, 1355 (Colo.1983); *Jangula v. Klocek,* 284 Minn. 477, 488, 170 N.W.2d 587, 594 (1969); *Means v. Sears, Roebuck & Co.,* 550 S.W.2d 780, 789 (Mo.1977).

We find the logic of these cases persuasive. The result they produce is fair, and consistent with judicial economy, for the rule they espouse tends to make a defendant who has benefitted from a remittitur think carefully before he or she notes an appeal. *Doe*, 492 A.2d at 862; Note, *Civil Procedure—Remittitur—Remitting Parties' Right to Cross–Appeal*, 49 N.C.L.Rev. 141, 148 (1970). We hold that a plaintiff who has accepted a remittitur may cross-appeal if the defendant in the case has noted an appeal, at least when the plaintiff has not accepted payment of the reduced judgment and filed an order of satisfaction.[7]

### III.   RECUSAL

Since Surratt's and Jackson's cross-appeal was properly taken, we must now consider their assertion that the trial judge should have recused himself. The argument is made against the backdrop we now sketch.

### A.

This action was filed in the Circuit Court for Prince George's County on 17 March 1987 and on 12 June was specially assigned to the judge who ultimately presided at the trial. The jury trial began on 31 May 1988. In the interim numerous motions (to dismiss, for summary judgment, to compel discovery) were filed, argued to, and decided by that judge. The trial lasted until 8 June, culminating, as we have recounted, in substantial judgments in favor of the plaintiffs. The reader will recall that those were followed by the County's motion for judgment n.o.v., or for new trial, or remittitur. The judge granted the last of these on 25 August 1988. Surratt and Jackson then moved to vacate the remittitur order and for recusal of the judge.

---

7.   It is noteworthy that Chapter 428 of the Acts of 1990, effective 1 July 1990, adds the following sentence to § 12–301 of the Courts Article: "In a civil case, a plaintiff who has accepted a remittitur may cross-appeal from the final judgment."

At the hearing on that motion, counsel for Surratt and Jackson stated on the record "facts with respect to [the judge's] personal conduct with respect to [counsel] prior to the trial and for a ten-year period of time." The incidents recalled by counsel began in 1978, when she opened her new law office in Prince George's County, with a telephone call from the judge, who identified himself by his first name, congratulated her on the opening of her office, and suggested that she come to his chambers late some afternoon. When the lawyer hesitated in responding, she remembered, the judge offered her "a continuance for two weeks to give the matter more thought." This, the lawyer said, was followed some four days later by another phone call from the judge (again identifying himself by his first name) and asking for an answer to his suggestion. She declined it.

Thereafter, according to the lawyer, when she encountered the judge in the courthouse from time to time he would chat, flirt, and make comments about her personal appearance. Her concerns about possible judicial resentment and retaliation because she had rejected the judge's proposals were alleviated, however, when she was told that she was not the only object of the judge's attention because the judge "hits on everybody." She reasoned that if the judge did "hit on everybody" it couldn't be "that uncommon" for him to be rejected. Shortly before the Surratt trial, however, those concerns were somewhat revived.

The lawyer had two medical malpractice cases assigned to the judge, one of them being this case. Six days before the Surratt trial, there was a settlement conference in the other case. After the other attorneys had left the judge's chambers, there was a conversation between Surratt's lawyer and the judge during which, she stated, he asked her whether she had a "steady" yet. She asked if he had someone in mind. His response was "Yes, me." Her reply was "Forget it."

Thereafter, counsel claimed, the judge by facial expression and body language conveyed to the Surratt jury his lack of patience or his exasperation with her efforts. She

said her client noticed this and wanted to know why the judge was treating her so badly.

After the plaintiffs in *Surratt* had rested, there was a chambers' conference about scheduling expert witnesses. During the conference the judge asked counsel for Surratt "Do you want to give me your phone number now?" She answered "Over my dead body."

On the basis of this history, Surratt's and Jackson's lawyer argued that the judge was in effect "a piqued suitor" of hers, and, therefore, his impartiality might reasonably be questioned. She urged that he vacate the remittitur order and disqualify himself from further proceedings in the case. The judge said "That's denied" and the hearing ended after counsel had accepted the remittitur.

## B.

■■■■ There is no doubt that counsel believed that over a period of years she had been the subject of the judge's unwelcome sexual advances. Her account, as detailed above, was essentially uncorroborated, although a portion of it, the request for the telephone number, was recalled, just as counsel stated it, by another lawyer who had been in chambers at the time. But the accuracy of the account is not really in question. The judge made no effort to deny what counsel put on the record, nor did he offer any sort of explanation. His only comment during the lengthy recital was "I don't have any recollection of what you are talking about." There is nothing inherently incredible about the history set forth by counsel.

We are aware that some judges are reported to "make verbal or physical sexual advances in the course of the professional interaction." Maryland Special Joint Committee, *Gender Bias in the Courts* 125 (1989). When this occurs, the female lawyer is placed in a difficult position "because of the power of the judge."

If the [lawyer's] response is perceived negatively, the judge has the power to retaliate against the lawyer and

her client. While the lawyer may be willing to accept the retaliation, she will refuse to place the client's interests in jeopardy. At the same time, if she makes no response, the problem will only continue.

*Id.* at 126 [footnote omitted].

This precisely depicts the predicament in which counsel in this case perceived herself to be entangled. A judge who places a lawyer in that sort of predicament, it might be argued, has failed to "observe high standards of conduct," Canon 1, Maryland Code of Judicial Conduct (Md. Rule 1231), and to "behave with propriety and ... avoid even the appearance of impropriety." Canon 2 A. Canon 2 A also points out that "[t]he personal behavior of a judge in both the performance of judicial duties, and in everyday life, should be beyond reproach." But our task in this case is not to consider what sanctions might be imposed upon the judge if he violated these or other provisions of the Code of Judicial Conduct; another agency is charged with initial responsibility in that respect. A Code of Judicial Conduct ordinarily "is enforced, absent substantial misconduct from the bench, primarily by means of disciplinary actions with advisory opinions serving as a secondary means of enforcement." *K & K Management v. Lee*, 316 Md. 137, 151, 557 A.2d 965, 971–972 (1989).

Nevertheless, the canonical provisions dealing with recusal may warrant appellate intervention if their prohibitions are disregarded. See *Doering v. Fader*, 316 Md. 351, 558 A.2d 733 (1989). In that regard, Canon 3 C(1) teaches that "[a] judge should not participate in a proceeding in which the judge's impartiality might reasonably be questioned...." That, of course, was the basis for the recusal motion in this case.

■ As *Doering* makes clear, the question of recusal, at least in Maryland, ordinarily is decided, in the first instance, by the judge whose recusal is sought, 316 Md. at 358, 558 A.2d at 736–737. *See also In re Turney*, 311 Md. 246, 253, 533 A.2d 916, 920 (1987); *State v. Calhoun*, 306 Md. 692,

747–748, 511 A.2d 461, 489 (1986) *cert. denied,* 480 U.S. 910, 107 S.Ct. 1339, 94 L.Ed.2d 528 (1987). When bias, prejudice or lack of impartiality is alleged, the decision is a discretionary one, unless the basis asserted is grounds for mandatory recusal. It will be overturned only upon a showing of abuse of discretion. *Turney* and *Calhoun,* both *supra; In Re Colin R.,* 63 Md.App. 684, 701, 493 A.2d 1083, 1091 (1985).[8] The standard to be applied is an objective one— "whether a reasonable member of the public knowing all the circumstances would be led to the conclusion that the judge's impartiality might reasonably be questioned." *Turney,* 311 Md. at 253, 533 A.2d at 920; *Md. Judicial Ethics Handbook* (1989), Judicial Ethics Committee Opinion No. 107, B–193, B–194 (1985).

Despite the usual Maryland rule, however, we believe there are some circumstances in which the judge whose impartiality is questioned should not himself or herself decide the merits of a recusal request. That is a statutory requirement in the federal system, where 28 U.S.C. § 144 provides:

> Whenever a party to any proceeding ... makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, ... such judge shall proceed no further therein, but another judge shall be assigned ... to hear such proceeding.

Similar provisions exist in other jurisdictions. *See, e.g.,* Col.Rev.Stat., R.Civ.Pro. 97 (1972); Fla.Stat. § 38.10 (1983).

---

**8.** Some early cases described the judge's decision on his own recusal as "not the subject of review." *See, e.g., Ex Parte Bowles,* 164 Md. 318, 326, 165 A. 169, 172 (1933). It was at one time not uncommon to describe discretionary decisions as unreviewable. *See In re Petition for Writ of Prohibition,* 312 Md. 280, 312, 539 A.2d 664, 679 (1988) (quoting *Auchincloss v. State,* 200 Md. 310, 316, 89 A.2d 605, 607 (1952) (ruling on motion for new trial)). The cases cited in the text, as well as many others, make it clear that a recusal decision is reviewable. *See also Brooks v. State,* 312 Md. 115, 538 A.2d 316 (1988).

Obviously, Maryland has no statute or rule similar to 28 U.S.C. § 144; *see also* Fed.R.Crim.P. 42(b). But we find an analogous situation in certain contempt proceedings. Maryland Rule P4 d 2 in general disqualifies a "judge who issued a citation for constructive contempt ... from presiding at the hearing" therein. Direct contempt is handled differently; Rule P3 a provides that direct contempt "may be punished summarily by the court against which the contempt was committed." That procedure is permissible when "the action of the alleged contemnor poses an open, serious threat to orderly procedure" so that there is a "need for immediate vindication of the dignity of the court." *State v. Roll*, 267 Md. 714, 733, 298 A.2d 867, 878 (1973). And yet, even in the case of direct contempt, instant action may not always be necessary to restore order and maintain the dignity of the court, or summary action may be unduly prejudicial to a party. Under those circumstances, "it is best to wait until the end of the trial" and then "it is generally wise to ask a fellow judge to rule on the nature of the conduct of the contemnor if it has in it elements of personal attack upon the judge." *Id.*, 298 A.2d at 879. *See also Md. Trial Judge's Benchbook*, § 3–506(b). Indeed, under some circumstances, due process problems may arise if a judge who is personally attacked makes a direct contempt ruling. *See Taylor v. Hayes*, 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974); *Mayberry v. Pennsylvania*, 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971).

We hold that when the asserted basis for recusal is personal conduct of the trial judge that generates serious issues about his or her personal misconduct, then the trial judge *must permit another judge to decide the motion for recusal.*

We recognize that this procedure has its drawbacks. It can delay a trial, for example, while a new judge is brought in, and put some strain on judicial staffing requirements. We stress, however, that the procedure is not likely to be frequently invoked. In the first place, the kind of personal misconduct that warrants its use should be rare. Allega-

tions that a judge has a financial interest in the matter (Canon 3 C(1)(a)) or is related to a party (Canon 3 C(1)(d)) ordinarily would not trigger the procedure, for allegations seeking recusal on those bases generally do not involve personal misconduct of the judge. The same is true when impartiality is questioned because of participation by the judge in earlier proceedings, as in *Doering, supra* and *Boyd v. State,* 79 Md.App. 53, 555 A.2d 535, *cert. granted,* 316 Md. 675, 561 A.2d 215 (1989). *See also Nash v. State,* 69 Md.App. 681, 519 A.2d 769, *cert. denied,* 309 Md. 326, 523 A.2d 1013 (1987); *In re George G.,* 64 Md.App. 70, 494 A.2d 247 (1985). Neither would such a procedure be necessary when the charges against the trial judge do not involve any personal misconduct. *See Calhoun,* 306 Md. at 746, 511 A.2d at 488.

Moreover, the recusal motion must set forth facts in reasonable detail sufficient to show the purported personal misconduct; mere conclusions as to lack of impartiality will not suffice. And it should be supported by affidavit or testimony or both.[9]

These requirements are similar to the federal requirement that an affidavit be filed which "state[s] the facts and the reasons for the belief that bias or prejudice exists." The standard for assessing the facts put forth by the complainant will be the objective standard currently used in

---

**9.** We deem this procedure preferable to one in which a merely conclusory allegation of bias is sufficient to disqualify a judge, and also better than one in which the challenged judge, or some other judge, holds a mini-trial on the truth of the allegations. The former practice renders it too easy to get rid of a judge. The latter can involve real disruption of a trial and if the recusal motion is heard by the challenged judge, offers many practical difficulties (*e.g.* does the judge defend himself against the allegations?) and the likelihood of even greater erosion of impartiality. For discussion of some of the problems associated with various recusal procedures, *see* Frank, *Disqualification of Judges: In Support of the Bayh Bill,* 35 Law & Contemp. Probs. 43 (1970); *Note, Meeting the Challenge Rethinking Judicial Disqualification,* 69 Calif.L.Rev. 1445 (1981); Note, *Disqualification of Judges for Prejudice or Bias—Common Law Evolution, Current Status, and the Oregon Experience,* 48 Ore.L.Rev. 311 (1969).

Maryland for other types of recusal motions. *See Turney,* 311 Md. at 253, 533 A.2d at 920. Using an objective standard precludes the necessity of delving into the subjective mindset of the challenged judge. A judge will be disqualified in any case in which his or her partiality is reasonably questioned on the basis of personal misconduct.

There is a possibility of improperly filed motions, to be sure—motions filed without any factual basis designed merely to get rid of a certain judge. The potential for judicial redress, however, makes it unlikely that unfounded recusal motions of this sort will be lightly filed. Lawyers have been held in contempt for questioning a judge's impartiality. *Ex Parte Bowles,* 164 Md. 318, 165 A. 169 (1933). *But see Holt v. Virginia,* 381 U.S. 131, 85 S.Ct. 1375, 14 L.Ed.2d 290 (1965). And in any case, a motion that turns out to be totally without basis in fact would subject the movant and counsel to the possibility of Rule 1–341 sanctions and also could be the subject of lawyer disciplinary proceedings. *See, e.g.,* Md. Rule 1230, Rules of Professional Conduct, Rule 3.1, 3.2, 3.3; *Attorney Griev. Comm'n v. Nisbett,* 316 Md. 464, 560 A.2d 18 (1989) (lawyer disciplined because, among other things, he knowingly made false statement of fact in violation of former DR 7–102(A)(5)); *Attorney Grievance Com'n of Md. v. Werner,* 315 Md. 172, 553 A.2d 722 (1989) (violation of former DR 7–102(A)(5)); *Attorney Grievance Comm'n v. Parsons,* 310 Md. 132, 527 A.2d 325 (1987) (lawyer disciplined because, among other things, he put false signature on complaint for divorce in violation of former DR 7–102(A)(5)); *Hauswald Bakery v. Pantry Pride,* 78 Md.App. 495, 507 n. 3, 553 A.2d 1308, 1314 n. 3 (1989) ("frivolous and unjustified filing of any motion, ... may not only be grounds for sanctions under [Md. Rule 1–341] but may also constitute a violation of Rule 3.1 of the Rules of Professional Conduct").

Finally, in order to trigger the recusal procedure we here prescribe, a motion must be timely filed. To avoid disruption of a trial, or the possible withholding of a recusal motion as a weapon to use only in the event of some

unfavorable ruling, the motion generally should be filed as soon as the basis for it becomes known and relevant.

The recusal motion filed here, as enlarged upon in open court, meets all of these criteria. It alleges sexual harassment by a judge, a matter we regard as involving serious personal misconduct.[10] It was supported by sufficient factual detail. "[A] reasonable member of the public knowing all the circumstances would be led to the conclusion that the judge's impartiality might reasonably be questioned." *Turney,* 311 Md. at 253, 533 A.2d at 920. The facts, it is true, were not set forth in an affidavit or by testimony under oath. They were, however, stated on the record by a lawyer who was competent to testify about them, and in the presence of opposing counsel and the judge who was the subject of the charges. In the circumstances, we view this as the functional equivalent of an affidavit or testimony. The lawyer would have been subject to serious sanctions for making false statements.

Additionally, we think the motion was timely. The County argues that the 10–year history recounted by counsel was known when the judge was specially assigned, and recusal should have been sought then. Of course it could have been; perhaps it would have been better had it been. But counsel gave a reasonable explanation as to why she did not ask for it then. Before trial, counsel had no reason to believe that she would not get a fair trial. It was only after the trial was nearing its end that counsel began to feel that her clients were not getting a fair trial. Perhaps counsel could have made the recusal motion before the remittitur, but there were also good reasons for not doing so. To make the motion in the midst of trial would have or could have caused disruption and delay. To make the motion before the judge ruled on the remittitur request might have prejudiced the clients and produced an even more drastic remittitur, or perhaps an adverse judgment n.o.v. The lawyer also was reluctant to make the motion

---

**10.** We intimate no view as to the truth of these charges.

until she could point to some indication of prejudice. Under the special circumstances of this case, we are not prepared to say the motion was untimely.

## IV. FURTHER PROCEEDINGS

We have determined that the 1986 version of § 1013 of the Prince George's County charter is invalid, but that the limitations of liability provisions contained in the 1976 section are valid. Because one aspect of those limits depends upon the provisions of any applicable liability insurance policy the County may have, we shall order a remand to permit determination of whether there is such a policy. If there is one, its limits will apply to the judgments. If there is not one, the charter's $250,000 limit applies to the aggregate judgments.

Pending the insurance policy determination, we shall direct that the judgment of the Circuit Court for Prince George's County be vacated, as well as its order of 23 December 1988 refusing to assess arbitration and deposition costs against the County.

Before any determination about the insurance policy is made, however, it will be necessary to deal with the recusal problem. Another judge shall be assigned to decide the recusal motion.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTION TO VACATE THE 3 OCTOBER 1988 JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AND ITS ORDER OF 23 DECEMBER 1988 WITH RESPECT TO COSTS, AND TO REMAND THIS CASE TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.